Syllabus.

## Richmond.

### CHRISTIAN AND OTHERS V. BULBECK.

#### November 16, 1916.

1. BOUNDARIES—*Ascertainment—Acts 1912, p. 133—Scope of Act.*— The act of March 4, 1912 (Acts 1912, p. 133) allowing a petition to be filed to ascertain the true boundaries of land, confers upon the court jurisdiction to pass upon the title to the land included in the boundary line or lines fixed by the judgment of the court, and the defense of adverse possession for the statutory period may be set up as a defense to such petition.

2. BOUNDARIES—*Location—Acts 1912, p. 133—Ejectment.*—The title of the plaintiff in the case at bar being a fee, and the controversy being with the owners of "coterminous real estate" as to the true location of boundary lines between the plaintiff and the defendants, the plaintiff had the right to proceed under the statute and was not driven to an action of ejectment.

3. BOUNDARIES—*Preference of Corners Over Courses.*—In ascertaining the boundary lines of land, distance or length of lines called for in deeds and plats, and acreage, must give way to fixed and ascertained corners and reputed boundaries established by ancient but distinct land marks

4. BOUNDARIES—*Acts 1912, p. 133—Plaintiff's Title.*—In a proceeding under Acts 1912, p. 133, to fix boundaries and to recover the land lying between the true boundary and the boundary claimed by the defendants, the plaintiff must recover upon the strength of his own title.

5. EVIDENCE—*Boundaries—Plats.*—A plat not referred to in or made a part of the chain of title of either plaintiff or defendants, on the trial of a petition under Acts 1912, p. 133, is not admissible as evidence of the extent or location of the metes and bounds covered by the true title, or of that covered by the color of title of the defendants.

6. ADVERSE POSSESSION—*Taking Possession—Harmless Error.*—In fixing the duration of adverse possession, a party has the right to tack to his possession the possession of those under whom he claims, but the omission to make any reference to this right in an instruction is harmless where the testimony

is to the effect that the only possession claimed was that of the party himself.

7. INSTRUCTIONS—*Application to Evidence.*—Instructions should be read with reference to the evidence in the case in which they are given. Although correct with reference to a case to which they are applicable, they may be erroneous when applied to a different state of facts.

8. ADVERSE POSSESSION—*Mistake as to Boundary—Claim to Line on the Ground.*—The proposition that adverse possession does not exist where the party occupied and possessed the land in controversy through a misapprehension or mistake as to his boundary, with no intention to claim what did not belong to him, but only intending to claim to the true line, is sound in principle only where in fact there was no intention to hold adversely up to the boundary line *on the ground* unless that were the true boundary. It does not apply where it is shown that a specific intention exists on the part of the possessor to claim title to *a definite line on the ground* in fact beyond the true title. If a party takes and holds actual possession beyond his true boundary line, and with good faith, though mistaken, claims title to and occupies the land, his possession is adverse to the extent of his actual possession, and such possession, if continued unbroken for the statutory period, will ripen into a perfect title under the statute of limitations.

9. ADVERSE POSSESSION—*Mistake as to Boundary—Presumption as to Extent of Claim—Claim with Reference to Line on the Ground.*—Where the proof is that the location of the line in question was caused in the first instance by a mistake as to the true boundary, the other facts and circumstances in the case must negative by a preponderance of evidence the inference which will otherwise arise that there was no definite and fixed intention on the part of the possessor to occupy, use and claim as his own the land up to a particular and definite line of the ground. That is to say, on the whole proof a case must be presented in which the preponderance of evidence as to the character of the possession, how held, how evidenced on the ground, how regarded by the adjoining land owner, etc., etc., supplies the proof that the definite and positive intention on the part of the possessor to occupy, use and claim as his own the land up to a particular and definite line *on the ground* existed, coupled with the requisite possession, for the statutory period, in order to ripen title under the statute. Whether the positive and definite intention to claim *as one's own* the land up to a particular and definite line *on the ground* existed, is the practical test in such cases.

10. BOUNDARIES—*Acts 1912, p. 133—Monuments and Corners Preferred to Lines and Acreage—Instructions.*—In a proceeding under the statute to ascertain the true boundary of land an instruction that "a correspondence in quantity given by a line in question with the quantity mentioned in the deed, or in the approximation thereto, may be considered as going to establish such line as the true one," gives too great prominence to the mere acreage. While it is a circumstance bearing on the establishment of such line, it is of less weight than natural monuments, corners or reputed boundaries and the jury should have been so instructed.

11. INSTRUCTIONS—*Jury Fully Instructed.*—Where a case has been fairly submitted to the jury on proper instructions it is not error to refuse other instructions tendered.

Error to a judgment of the Circuit Court of Amherst county in a statutory proceeding to ascertain the boundary of land. Judgment for the petitioner. Defendants assign error.

*Reversed.*

The opinion states the case.

*Caskie & Caskie,* for the plaintiffs in error.

*Scott & Meeks* and *O. L. Evans,* for the defendant in error.

SIMS, J., delivered the opinion of the court.

This case is a proceeding at law under Acts of Assembly 1912, p. 133, by the appellee, plaintiff in the court below, against the appellants, defendants in the court below, by the following petition:

"Your undersigned petitioner, Marion Bulbeck, respectfully shows unto the court that in accordance with an act of the General Assembly of Virginia, approved March 4, 1912, contained in chapter 74 of the Acts of 1912, page 133, she is filing this, her petition, in your honor's court for the

purpose of having determined the true· boundary line or lines to certain real estate, situated in the county of Amherst, of which your petitioner and C. Burks Christian and Sallie B. Christian, jointly, are the coterminous owners in fee simple, and as to which a dispute has arisen as to what· is the true boundary line or lines between your said petitioner and said Christians.

"Your petitioner shows unto the court that by deed dated June 28, 1893, recorded in Deed Book VV, page 57, of Amherst county clerk's office, one John H. Lewis and wife conveyed to your petitioner a tract of 48 acres of land on James river, in Amherst county, it being the same land conveyed to said Lewis by John C. Mundy, trustee, in deed dated October 20, 1891, recorded in Deed Book TT, page 521, of Amherst county, and the same land conveyed to John C. Munday, trustee, by Drewry J. Christian and wife, by deed dated August 20, 1873, and recorded in Deed Book JJ, page 222, of Amherst county, and the same land of which Stephen W. Christian, the father of said D. J. Christian, conveyed his life estate in deed of September 2, 1868, recorded in Deed Book GG, page 194, of Amherst county, and being a part of the same land allotted to Moaning Christian, the grandmother of the said D. J. Christian, and at her death partitioned among her children, a copy of which partition is herewith filed marked 'Exhibit X' (See Will Book No. 9, pp. 416 and 422).

"Your petitioner further shows unto the court that the true location of the lines between her and said Christians has never been fixed and determined and that recently there has been litigation and disputes between them as to what is the proper location of said boundary lines.

"Your petitioner further shows unto the court that one J. C. Fulcher, as tenant of said C. B. Christian and said S. B. Christian, is cultivating, for the present year, a portion of the land, which, as your petitioner alleges and charges, is a

part of said boundary purchased by her and part of said land which is now in dispute.

"Your petitioner further shows unto the court that said C. B. Christian and S. B. Christian own said adjoining real estate in fee simple as two of the heirs of their father and as grantees of the remaining heirs; that originally the land of your petitioner and said Christians belonging to one Drewry Christian and allotted to his heirs and as dower to his wife Mourning Christian, of whom said C. B. Christian and S. B. Christian are descendants, and at the death of whom the said Mourning Christian was allotted the said tract of land contained in said plot filed herewith as 'Exhibit X', the other lands held by said Christians, adjoining your petitioner's said . . . . . . acres, being part of what was allotted to the heirs of said decedent.

"Your petitioner alleges and charges that the confusion in the location of this line is largely due to the fact that the parties owning the same were related and no action was taken to determine what were the proper lines, and it has only been within the last two or three years that your petitioner was made aware of the fact that the true line had never been located.

"Your petitioner still further alleges and charges that she has made every possible effort to get the said Christians to agree upon the establishment of a line between the properties aforesaid; that she has even gone to the expense and trouble of purchasing the necessary material to build a proper fence so as to secure her own cattle and stock from trespassing and to prevent other people's stock from trespassing upon her, but the said Christians have refused to agree upon a line or to permit her to put up a fence upon any line that has been run by surveyors employed by petitioner, going so far as to threaten violence toward any and all she employed to build such fence.

"Your petitioner, therefore, asks and prays that this, her petition, shall be considered of by this honorable court at its next civil term, and in the meantime your petitioner asks that a competent surveyor, or surveyors, be ordered and directed to enter upon the premises in question and establish by such survey as may be deemed necessary the true boundary lines between the said several plots of land, the same to be used as evidence at the trial of this case, and that the true line between her and C. B. and S. B. Christian may be determined, and she may be given possession of such land as she is entitled to by the proper location of said line, with such damages for its retention as may be proper in accordance with the statute in such cases made and provided, and that all other proper relief may be granted her."

There was a demurrer to the petition by defendants on several grounds, only one of which, however, is relied on here, which ground is as follows:

"The remedy, if any, of the plaintiff is one in ejectment."

Counsel for defendants, in their petition, in amplifying this ground of demurrer, take the following positions:

"The act approved March 4, 1912 (Acts 1912, page 133), gives the right to any person having an interest in real estate, to file a petition, and 'have ascertained the true boundary line or lines to such real estate as one or more of the coterminous land owners.'

"It is submitted that this act does not substitute the petition therein provided for, for an action of ejectment. A party can not come into court alleging that she has had a survey made of the land, and knows where the true boundary is, and ask the court to confirm her opinion, because, forsooth, some adjoining land owner is unwilling to admit that she is entitled to a piece of land of which he and his predecessors have been in possession for seventy-five years.

"To illustrate: If A owns and occupies a lot which is fenced in and B claims and occupies an adjoining lot, like-

wise fenced in, A will not be heard by this sort of summary
proceeding to have the court determine that his lines em-
brace B's lot, and dispossess him thereof. If a party does
not know where his lines are, he may, by this proceeding,
have them ascertained and then institute his proceeding to
recover what he does not have in possession if he so deter-
mine.

"This view is strongly fortified by the fact that the act
contains no provision for possession, or for damages for
the unlawful possession. It is impossible to believe that if
the intention of the legislature had been to settle all ques-
tions of title that it would have failed to provide for a judg-
ment for the possession and for damages.

"Again, the court is restricted by the act to ascertain and
designate 'the true boundary line or lines.' What is the
'*true* boundary line'? The word 'true' is defined to mean
'real,' 'exact,' 'accurate,' 'correct,' 'right,' and in this sense
it is used in the statute referred to. The jurisdiction of the
court is to find 'the real line,' 'the exact line,' 'the accurate
line,' hence it could not consider any question of estoppel,
act of limitations, or any other matter, which, under the
law, would allow the party to claim what was not his 'real,'
'correct,' or 'accurate' boundary, and hence the defendant
could not avail himself of the admissions of the plaintiff of
his claim of title, or color of. title, adverse possession or
other defenses which the law says avail him, no matter how
defective his real, accurate, true title is.

"Where each party claims to know the real, true bound-
ary, and a definite piece of land is in dispute, *the question
at issue is not one of boundary, but one of title.*

"This view seems to have been held by the draftsmen of
the petition in this cause, who felt called upon to aver
therein that the true boundary lines had 'never been fixed
and determined' (Rec., p. 3), although he filed with his

petition a plat which fixes and determines every one of them, and rests the whole case upon the correctness thereof.

"The demurrer should have been sustained, and the plaintiff remanded to the proper action to assert title to the eight acres of land which she claims, but of which the defendants had possession and to which they claimed title."

The court below overruled the demurrer, and such action is assigned here as the first ground of error.

In considering such assignment we are called upon to decide the following questions:

1. Did the act of Assembly, 1912, p. 133, give the court jurisdiction to pass upon the title to the land included in the boundary line or lines fixed by the judgment of the court in a proceeding under that act?

We think it did.

The act is as follows:

"Chap. 74.—An Act to authorize the ascertainment and designation of the boundary line of real estate.

"Approved March 4, 1912.

"1. Be it enacted by the General Assembly of Virginia, That any person having an interest in real estate upon petition filed in the court which would have jurisdiction in an action of ejectment concerning such real estate, shall have the right to have ascertained and designated by the said court, the true boundary line or lines to such real estate as to one or more of the coterminous landowners. All parties interested in the coterminous real estate shall be made parties to the said petition which shall be matured for hearing as provided for maturing an action of ejectment, except that it shall not be necessary to serve a copy of the petition.

"The trial shall be conducted as other trials at law and the same rules of evidence shall apply and the same defenses

may be made as in other actions at law; the trial by jury may be waived by consent of parties, the judgment of the court shall be recorded in the common law order book and in the current deed book of the court, and indexed in the name of the parties to the petition. The court may upon, application of either party to the petition, by order in term time or in vacation, direct such survey or surveys to be made as may be deemed necessary. The judgment of the court shall, unless reversed, forever settle and determine and designate the true boundary line or lines in question, and be binding upon the parties to such petition, their heirs, devisees and assigns. The judgment of the court shall be subject to the review by the Supreme Court of Appeals of the State upon writ of error."

The concluding provisions of the act, that "The judgment of the court shall, unless reversed, forever settle and determine and designate the true boundary line or lines in question, and be binding upon the parties to such petition, their heirs, devisees and assigns," seem to us to be conclusive of this question and to decide it in the affirmative.

The act also provides that, "The trial shall be conducted as other trials at law and the same rules of evidence shall apply and *the same defenses may be made as in other actions at law* \* \* \*" (Italics ours.) Hence, adverse possession, whether with or without color of title, under a plea of the statute of limitations, is a defense which may be made under such act.

2. As to what "interest in real estate" in the plaintiff is necessary to enable him to institute an action under the statute, or as to what cases of controversy over boundary line or lines of land involving dispute as to the title of the land included therein, the act applies, or as to what other defenses may be made in such a proceeding, we do not at this time decide, because not necessary for the decision of the case before us; except that we are of opinion and do

decide that the plaintiff in this case appears from the allegations of said petition to have had such an "interest in real estate," being a fee simple interest, as was sufficient to enable her to institute this action under said statute and that as this case, per said petition, involves a controversy between "coterminous real estate" owners as to the true location of boundary lines, which in effect involves a controversy as to the title or ownership of the land included in such boundary lines, it is such a case that the act in question applies thereto.

We are, therefore, of opinion that the court below committed no error in overruling the demurrer.

There was a trial by jury in the case, and a verdict and judgment in favor of the plaintiff, fixing the boundary lines as claimed by the latter as the true boundary lines between her land and that of the defendants; thus, in effect, determining that the land between the lines as claimed by the plaintiff and those claimed by the defendants, consisting of about eight acres, belonged to the plaintiff.

There are the following other grounds of error assigned in said petition:

a. The refusal of the court below to set aside the said verdict and grant a new trial;

b. The refusal of such court to admit in evidence a certain plat found spread on the official surveyor's book of Amherst county of 1803 to ......, p. 116, in what defendants claim was the handwriting of H. L. Brown, who was at one time assistant surveyor of Amherst county, but now deceased, bearing no date or signature of any surveyor, or statement thereon with respect to the identity of the land it included, except the lines of the plat and courses and distances thereon and natural landmarks noted thereon, such as James river, Christian's island, the acreage of the latter as 13½ acres, "up the branch", "Gate at the Dwelling House" &c., "Pointers Dogwood, Gum & White Oak," "White

Oak," &c., designating lines and courses, the general out-line and shape of the land covered by such plat being simi-lar to the outline and shape of the outside lines of a plat introduced in evidence by plaintiff, made in 1837, Septem-ber 15th, by H. L. Brown, assistant surveyor of Amherst county, as Exhibit X with her petition, the latter plat being signed by him and showing the division of the Mourning Christian dower land into lots—the former plat being claimed by defendants to be a plat of the said dower land made when it was assigned to said widow, but no report of such assignment or order of court, or deed or other writing was introduced in evidence, either by defendants or plain-tiff, which refers to such former plat or authenticates it as binding on any of such parties to this suit. It should be said also that the length of one important boundary line of said dower land as given on the plat not admitted in evi-dence is different from the length of such line as given on said plat introduced in evidence by the plaintiff.

c. The giving of certain instructions, A, B, C and D, for plaintiff.

d. The refusing of certain instructions numbered 1 to 7 inclusive, offered by defendants.

Before considering the questions arising upon these as-signments of error, we will state briefly the salient facts in the case bearing upon such issues.

The plaintiff and defendants derive title from a common source, Drewry Christian, who died in 1818. The following plat shows the dividing boundary lines, which we have in-dicated by the letters A, B, C, D, E, which are in contro-versy in this proceeding.

AMHERST COUNTY, Sct:
    The annexed is the plat of a tract of land in the county aforesaid lying on the north side of James river, it being the same land of which Mrs. Mourning Christian died possessed as her dower, and is bounded by the lands of Col. Wm. Dillard, Stephen Christian, Chas. M. Christian and Isaac Walker and contains 169½ acres including the James River and Kanawha Canal which runs through it.
Surveyed by order of court, Sept. 15, 1837.

H. L. BROWN, Asst. Surv.

A Copy

W. E. Sandidge, Clerk.

Teste:
Copied from Will Book 9, p 422.

Plaintiff derived title as alleged in her petition to lots No. 3 and No. 4 shown on such plat, and there is no conflict in the evidence that for about sixty-seven years prior to this suit, that is, up to about three years before such suit, neither the plaintiff nor any of those under whom she claims title, exercised any acts of ownership with claim of title beyond the location on the ground of the lines A, B, C, D, E, as marked by an old rail fence, from a very early time, not definitely fixed by the evidence, and later by a well defined hedgerow of trees and other growth, such as plainly

indicated a very old fence location. That the old mansion house of Drewry Christian was located on said lot No. 4 near the corner C, which was occupied by subsequent owners of lots No. 3 and No. 4 until it was destroyed by fire soon after the plaintiff acquired these lots, after which she or members of her family lived in another house on same premises. That these old fences and hedgerows marked lines were therefore very near this old Christian family residence and constantly in sight from thereabout and in passing to and from it. That the owners on both sides of these lines back to within a few years after the division of land shown by said plat "Exhibit X," including the plaintiff, up until 1910, recognized this old fence and hedgerow as the outside boundary lines of their land on both sides of it, respectively, both sides claiming title up to and only up to such old fence and hedgerow location of such lines. That about 1893 there were remains of such old fence apparent along such location, or on parts of it, and the said hedgerow, or growth of bushes and trees, plainly indicating an old fence location all along these lines, and such hedgerow remained along the most part of said lines A, B, C, D, E, down to the institution of this suit, except that on the line from D to E most of the growth was cut down in recent years; but a wire fence was built and maintained by the plaintiff from about the year 1893 on or along the line A, B, C, D, E, on said lots No. 3 and No. 4 partly inside but practically along and on the site of said old fence and hedgerow location, until the institution of this suit. Plaintiff located this wire fence in ignorance of the true location of said boundary lines A, B, C, D, E, in accordance with her title as claimed by her since 1910. If such boundary lines were located on the ground, as the plaintiff claims they should be, which she claims is the true location thereof according to said plat, "Exhibit X," they would extend some one hundred and fifty-feet to the northwest, north and north-

east of said old fence and hedgerow and of said wire fence location and include the land in controversy, above referred to, of about eight acres. Plaintiff furnishes no proof that there was any mistake made in the original location of the old fence except the testimony of Garland and DeMott, surveyors, as to the conclusions reached by them from their recent surveys in regard to the true location of such lines per said plat "Exhibit X." It appears that she did not discover the alleged mistake in the location of her wire fence until 1910, when she was having some surveying done, and then undertook to extend her fence out to such boundary lines—as thereafter claimed by her, and was prevented from so doing by the threat of Col. C. B. Christian, one of defendants, to prevent by force this being done.

The defendants derived title by descent and conveyances to lots No. 2 and No. 5, and the land adjacent and to the northwest and north of these lots, known as the "Burks tract," tracing their title back also to said plat "Exhibit X" as to the portions of said lines A, B, C, D, E, which lay from A to B and from D to E, and tracing their title back of such plat to the portion of said lines which lay from B to C; and the uncontradicted proof is that they claim and have claimed, for at least seventy years prior to the institution of this suit, title up to the said old fence and hedgerow location of said boundary lines, and they claim also that such is the true location of such lines according to said plat "Exhibit X."

In the chain of title of defendants, prior to the said division of said dower tract and plat, "Exhibit X," there is a deed from Mary Burks and husband of date January 9, 1818, which conveyed to C. M. Christian, the father of defendants, the said "Burks tract." The Burkses derived this land from Drewry Christian in the division of his land in 1818, when the Mourning Christian dower tract was also assigned.

The testimony for defendants of C. G. Massie, surveyor, which is uncontradicted, is to the effect that he surveyed the Burks tract, and that by such actual survey its boundary line next to land of plaintiff extends on the ground to the points B, C, D, of the said line A, B, C, D, E, as their location is claimed by defendants, being the same location as said old rail fence and hedgerow on such portion of such line.

The Burks deed, therefore, gave the defendants color of title, if not title, to that portion of the strip of land in controversy which lies from B to C to D, along the said line A, B, C, D, E. If the true location of the line A, B, C, D, E, as designated on said plat "Exhibit X" was as claimed by defendants and as shown by said old rail fence and hedgerow, the Burks deed gave to the father of defendant and also to those claiming title under him by descent as aforesaid, title to such line. If the true location of such line was as claimed by plaintiff, still, as the metes and bounds called for in the Burks deed extended beyond and over the line as claimed by plaintiff to the line as claimed by defendants, it gave the latter color of title to such location on the ground of the line B to C to D, as claimed by them.

As to the possession of defendants, it is deemed sufficient to say that regarding this case as upon demurrer to evidence by defendants, the evidence for defendants as to possession is not of that specific and definite character which is essential to prove the *pedis positio,* or actual possession, of the strip of land in controversy, or any part of it, for the statutory period, necessary for the application of the bar of the statute of limitations where the defendants have no title or color of title. That is to say, such testimony goes to the extent of proving open, notorious, actual, hostile and uninterrupted or continuous possession by defendants for at least seventy years only of some portion of the Burks tract, which, under said title or color of title, gave them construc-

tive possession up to the said line B to C and C to D, por-
tions of line A, B, C, D, E, as claimed by defendants, and
also only of some portion of lots 2 and 5, which if the true
title lines thereof are as defendants claim, would give them
constructive possession up to A to B and D to E, portions
of the line A, B, C, D, E; but the testimony does go to that
extent. On this subject, and as to the Burks tract and also
lots 5 and 2, Col. C. B. Christian, one of defendants, who
was in his eightieth year when he was on the witness stand,
testified as follows:

"Q. Colonel, how long have you and your sister held this
land of yours, I mean especially the strip of land" (in con-
troversy) "and how have you held it, if you did hold it? A.
We have held it adversely for seventy years to my knowl-
edge and I believe for many years before that by my fore-
fathers, certainly back to the Drewry Christian division of
1815 or 1818, had uninterrupted possession, notorious, open
and actual against Miss Bulbeck and the world * * *"

\*          \*          \*          \*          \*          \*          \*

"Q. Do I understand you to say that you and your sister
have had adverse possession of all the land on your side of
Miss Bulbeck's fence (when I say adverse you as a lawyer
know what I mean) for the last seventy years? A. I do."

It is true that this was a statement of a conclusion of
the witness and not of the specific facts on which the con-
clusion was based, but it was not excepted to and the other
testimony in the case does not contradict its accuracy in
so far as it refers to possession of parts of lots 5 and 2
and the Burks tract not included in the strip of land in con-
troversy.

Col. C. B. Christian's testimony therefore shows the pos-
session above indicated by him and his sister with the defi-
nite and unconditional claim of title and ownership on
their part, and the intention to so claim title to the line A,

B, C, D, E, as located on the ground per the old rail fence and hedgerow.

Miss Sallie B. Christian's testimony shows the same, only she adds: "Of course, we did not want any land but that which belonged to us; we would not have any land other than that that belongs to us, we intended only to hold to the true line wherever it was."

Now as to the location on the ground of the "Gate near the Mansion House," called for as a corner on said plat, "Exhibit X," and the actual location on the ground of the line A, B, C, D, E, in accordance with such plat. Col. C. B. Christian is not contradicted in his testimony that he remembers this line as far back as "seventy years at least since I can first remember," which would place his personal recollection back to 1843, six years after said plat "Exhibit X" was made; and he says: "These lines are as near as can well be where Miss Bulbeck's present fence is, * * *"

"Q. How do you know this? A. I know it by surveys properly located, and also by what * * * Uncle Stephen Christian, who owned Miss Bulbeck's lands, as well as what Drewry J. Christian, his son, all of them told me. They all said the rock or gate referred to in H. L. Brown's plat of Mourning Christian's dower * * * shows the true corner and starting point, and the only known or well established corner between these lands. These old people all recognize this as the corner, and this rock is not a movable rock, but is one called a tight rock, and juts out on top of the land, and the lines between our lands and Miss Bulbeck's land take this rock as a corner, and run approximately with Miss Bulbeck's present fences, and were so recognized as the true lines by our family, and Uncle Stephen Christian, who owned lots No. 3 and No. 4, and at his death fell to his son, D. J. Christian, my first cousin. At or within a few feet of this rock was a gate, and I remember that there one of my aunts, who was riding horseback through this gate,

going over to Uncle Stephen's house (which was later burned, after Miss Bulbeck bought it) was thrown from her horse and broke her hip, and she was an invalid the balance of her days."

Mr. Garland, a civil engineer, was appointed by the court below to survey and report upon the lines in controversy. He reported in favor of the lines as claimed by plaintiff, and testified that in his opinion such location is the true location on the ground of such lines. He filed a plat showing thereon in yellow lines the location on the ground of such lines as claimed by defendants and in red line the location on the ground of such lines as claimed by plaintiff.

Mr. Garland's testimony pertinent to the issues in this case was as follows:

"I am surveyor and engineer by profession, live in Lynchburg, and have had several years' experience as such, and am a graduate of Virginia Military Institute. * * * At the request of Col. C. B. Christian I started at what is known as the rock corner, near Miss Bulbeck's residence, claimed by the defendants as the corner, and ran the lines first northeast, and thence to the river, which lines approximately in shape and location fitted the present fences between Miss Bulbeck and the Christians, that is I mean the line between the Burks tract of north 48 poles or the old line north 44 east, 48 poles to corner of lot No. 2; thence S. 46 east 78 poles, or the old line south 50 east 78 poles, the difference being in bearing to corrected change on account of the variation in needle of instrument in time of two surveys, and I found these two lines approximately fitted the present fence on the ground. I then ran from the rock corner north 35 west 9 poles, and thence south 61 west or the old bearing, south 57 west, 58 poles towards S. B. Walker's line, which distance ran over the fence between Walker, Bulbeck and Christian at the northwest corner of Marion Bulbeck's ———— poles. I then started at the end

of north 44 east 48 poles, between lots No. 2 and No. 3, supposed corner of Christian and Bulbeck, and extended the line north 44 east 48 poles, and I did not reach the branch in plat, corner called for on branch being Col. William Dillard's line on the northeast, which should be the corner of lot No. 2 and the Burks tract in Dillard's line. Then I begun on James river, where there was no corner named, except on river, and ran the line between S. B. Walker's estate and Miss Bulbeck. The distance of Miss Bulbeck not being given I obtained it by my scale on the plat of the partition of Mourning Christian's dower, and by old trees supposed to be the line trees and somewhat with the present fence, and the distance obtained by the scale on the Mourning Christian's dower division I ran the distance shown by this plat I filed with my report, which ran over, on the defendants' lands, as claimed by them. I then ran as indicated on the plat the red lines parallel to the three lines I ran from the supposed rock corner claimed by the Christians over to the branch on the Dillard line on the northeast, the measurements of these three red lines about took me to the branch on the Dillard line. I came back and extended the line from James river on between Walker and the Christians north 27 west distance given by the plat claimed to have been made for the Walker tract from the river, and this distance stopped at an old tree or near it, but I could not discover well defined marks on same. Some claimed it as the corner in the line of lot No. 5, belonging to the Christians, and the corner of the Walker tract. I did not run any of the other lines of the Christians' lands, or the lands of the defendants, notably on the Burks tract and lot No. 5. My conclusion was the red dotted lines are the true boundary lines between the lands of the plaintiff and the lands of the defendants."

Opinion.

### CROSS-EXAMINATION.

By Counsel for Defendants:

"Q. Mr. Garland, your survey and conclusion, as I understand, are the result of starting at James river, at the supposed corner of Walker and Miss Bulbeck? A. Yes, sir.

"Q. If the bank edge of James river has changed since 1815 or 1818, the date of the division of the old Drewry Christian estate and the present bank, or where you started, is not the true or correct starting point, then are your conclusions and survey correct? A. Of course if the river has changed, and my starting point wrong, the location of the red lines on my plot would also be wrong.

"Q. In locating the lines from the supposed rock corner northeast, claimed by the Christians as the true corner, did Col. Christian not point out to you what he claimed to have been the location of an old barn on the northwest side and about half way of the line north 44 east 48 poles, which barn he claimed to have been there from the time he could remember up to several years ago, and which he claimed was a few feet on his side of the true line, between him and Miss Bulbeck. If this barn was on his side of the true line, as claimed by him, then the line as located by you was through the barn site or location on Miss Bulbeck's side was it not? Would not this show that your conclusion is wrong? A. Well, it might."

\*       \*       \*       \*       \*       \*       \*

"Q. On your map the yellow lines about correspond, as I understand, with the present fences of Miss Bulbeck, do they not? A. Yes, they do.

"Q. Where you located the red lines on your map, did you find any landmarks whatever fitting the bearings and distances? A. No, I did not.

"Q. I mean between the defendants and Miss Bulbeck, the plaintiff? A. No."

Mr. DeMott, a surveyor, also testified for plaintiff as follows:

"I surveyed the Bulbeck two lots * * * I ran from the rock as pointed out by Col. Christian, both ways, and my lines practically fitted Miss Bulbeck's fence, as at present. Then I ran the Walker line from the river and came to the conclusion that Miss Bulbeck's line should be located from the river and go out on the Christian side as indicated on Mr. Garland's plat by the red lines; my measurements agreed with Garland's as far as I made them. I made no measurement on the river; I think Mr. Garland's are correct in his survey, and conclusions. I should say that the trees on the river on the Bulbeck side are seventy-five years old.

"You can get lots No. 2, 3 and 4 on the ground; the land is there; Mr. Garland's survey is correct. If rock is right all else is wrong and acreage to Miss Bulbeck is too small and Colonel's too much. My survey and conclusions check with those of Mr. Garland, in every respect. Garland's estimate is correct; a discrepancy of one-fourth of an acre does not mean that the lines are wrong in making such survey. In my judgment Massie is not right and Garland is right. There are indications that James river has not changed from the trees, etc., from 75 to 100 years old. In surveys on rivers like the James the line starts at the low water level and not out in the water. My experience is that in surveying on James river there is very little change in it as evidenced at Pearch and other places. At Miss Bulbeck's land there is an inland that extends up beyond the starting point of her survey which Garland established by the red line, and that island serves to protect her land from washes by the river. I found the Walker line marked, but I found no hedgerows or fences to indicate any ancient line.

I consider the survey of Mr. Garland made from the records to be better and more accurate than the memory of any man. The white rock basis which C. G. Massie took is unquestionably wrong; Brown never took the rock as a basis and Brown is correct and made a good survey and with him Garland checks. The barn referred to possibly existed in 1818 and Brown ran the line in 1837. Charles M. Christian owned the whole land before the survey. I regard the barn as questionable and it does not stand to prove anything; memory fails and is made to change."

### CROSS-EXAMINATION.

"If the river has changed in the last seventy-five years of course the starting point on the Walker line is wrong, and then the conclusions arrived at by Mr. Garland and myself are also wrong."

### RE-CROSS-EXAMINATION.

"No one showed me the barn claimed by Col. Christian, or its side. The plat calls for gate but no rock on the H. L. Brown survey of Mourning Christian's dower."

C. G. Massie, a surveyor and witness for defendants, filed a plat locating the lines in controversy A, B, C, D, E, as claimed by defendants. His testimony pertinent to the said issues was as follows:

"I am county surveyor of Amherst county * * * I began the survey at rock or stone claimed by Col. Christian to be the corner near the corn house, supposed to be where the gate is called for near mansion house on H. L. Brown's plat. I ran the lines from that point both ways, and taking that as a corner I found the bearings and distances fitted pretty well the present fence of Miss Marion Bulbeck, thus indicating that whoever put up the fence hit the lines pretty well. I also surveyed the Burks tract, and found evidence

of an old line in the way of a hedgerow on the northwest side of this tract. Along lines from pointers south 51 W., 31 poles south 38 west 72 1-2 poles, south 52 1-2 east 12 2-5 poles pointers which aided me in my conclusion, in fitting up this tract with the Mourning Christian's dower; that the rock claimed by Col. Christian was a true corner, near the corn house. Then I took into consideration the barn, as claimed by Col. Christian * * * In running the line from the rock near the corn house north 44 east, 48 poles to corner of Christian and Miss Bulbeck; thence south 50 east 78 poles I practically hit the present fence, and the bridge on the canal, and continuing the line north 44 east, 48 poles to the branch on the Dillard line the true distance was 52 poles on the latter line a little short, and running from the rock north 39 west 9 poles, and thence 57 north 58 poles towards the Walker line I ran over what is supposed to be the Walker line several poles, but this happens frequently in old lines. I also ran the line beginning at the corner of Walker and Bulbeck's line on James river between Walker and Bulbeck, but there is no distance given on any plat I have ever seen on this line along with the Bulbeck line. Col. Christian showed me the rock. In making these surveys I did not consider the area of any of these tracts. The question was to locate the lines accurately between the parties. I did not put much faith in beginning at the river bank on the Walker line, as water streams are changeable, especially have I found James river so. I cannot agree with surveyor Garland in his conclusions. * * *"

Examined by Counsel:

"I have had little experience in surveying on James river. The lines in controversy are short when run from the river to Colonel's proposed line on the rock basis. I don't know anything about whether James river has changed or not. There are no marked trees or otherwise, that indicate the Burks line extending from the mansion house. There are

hedgerows that do not indicate lines. Never ran line from the river near Walker's or the full length of the Walker line. I did not pay any attention to the surrounding lots. * * * I could not see any material change in the branch. I ran around the 23-acre lot, called lot No. 2, but did not calculate the acreage. I did not estimate any acreage, nor did I run the line from the river. The lines are short when run from James river or else you would have to go into James river to get the acreage about 150 feet if the white rock basis is true."

We come now to consider the several assignments of error, which we will take up in their order above stated.

a. The refusal of the court below to set aside said verdict and grant a new trial.

1. We are of opinion that the verdict was contrary to the evidence in this, that the jury found and fixed the true boundary lines in question in accordance with the said survey and plat made by H. G. Garland, and such survey and plat entirely ignored the uncontradicted testimony of Col. Christian as to the location on the ground of the "Gate near Mansion House," and fixed that corner altogether by the length of the lines thereto from the Dillard branch on the one side and the Walker boundary line as this surveyor found it marked on the ground on the other side, giving undue weight to mere length of lines called for on said plat, "Exhibit X," as compared with the monument of the location of the "Gate near Mansion House," evidenced by the "tight rock" in practically the same place, as per Col. Christian's uncontradicted testimony; also in ignoring the existence of the reputed boundary line called for on said plat as marked by the old rail fence and hedgerow along the line in controversy, and making the existence of the present location of the reputed boundary of the Walker line outweigh and set at naught the existence of the old rail fence and hedgerow; also in making the length of the lines

ending on the river as called for on or ascertained by scale from said plat, "Exhibit X," outweigh the existence of said old rail fence and hedgerow and the facts aforesaid, showing it as the reputed boundary from such an ancient time, namely, for some seventy years, between the adjoining lands and the recognition by owners of lots 3 and 4 prior to the plaintiff of the correctness of the claim of title of defendants up to such line as so located on the ground, and indeed by plaintiff until 1910. It is true that the plaintiff explains why she treated this as her boundary until 1910, namely, because she was ignorant of what recent surveys she had made disclosed, and she also denies that she knew that defendants claimed title up to this old fence and hedgerow location until about the year 1900; but prior to the holding of the plaintiff, which as we have said began in 1893, back to a period of time seventy years before this suit, we have the uncontradicted testimony of said living witness as to the location of the old rail fence and hedgerow lines being recognized and treated by the land owners on both sides of it as the true boundary and delineation on the ground of the extent of their respective titles, as called for in said plat, "Exhibit X." This is proof of even more than a reputed boundary.

As was said by Judge Pendleton in *Shaw* v. *Clements*, 1 Call. (5 Va.) 438, "our juries generally and wisely establish reputed boundaries, disregarding mistaken descriptions."

And in *Herbert* v. *Wise*, 3 Call (7 Va.) 242, it is said: "To pursue the proper description of our land boundaries would render men's titles very precarious, not only from the variations of the compass, but that old surveys are often inaccurate."

As held in *Summerfield* v. *White*, 54 W. Va. 311, 315, 46 S. E. 154, 156, "If a monument called for by the deed is

established by uncontradicted evidence, it becomes binding upon the parties."

Applying the rule announced in the West Virginia case last cited to the monument, the "Gate near Mansion House," in the case at bar, its location, as testified to by Col. Christian, became established. This corner called for in the plat, "Exhibit X," being thus fixed, that corner became a marked monument; James river was a natural landmark; the reputed boundary of the lands in controversy was marked by the old rail fence or hedgerow. The dividing line in question, when located according to said plat, "Exhibit X," if the corner last mentioned is fixed as next above stated, corresponds on the ground with the line A, B, C, D, E, as claimed by defendants, and the only discrepancies that would then exist between such location and such plat would be the length of the lines of the plaintiff's land, those running from the river northwest being too short by about 150 feet, and the length of the lines running on the one side of such "Gate near Mansion" corner to Dillard's branch being too long by about 99 feet, and on the other side of such corner to Walker's line, as now marked on the ground, too short by about .....feet; and the acreage of the plaintiff's land being about 40 instead of about 48 acres, as called for in said plat. However, the rule on the subject is too well settled in Virginia to need a citation here of the authorities, that in such case distance or length of lines called for on the plat must give way to the fixed corner of the "Gate near Mansion," and the reputed A, B, C, D, E, boundary; that acreage called for must also give way to this data; and the correct location of the boundary line in dispute, according to the well settled rule in Virginia referred to, is the A, B, C, D, E line as claimed by defendants. The verdict of the jury was plainly in conflict with this rule, even regarding the evidence under the rule applicable to demurrer to evidence by defendants.

2. We are of opinion that the verdict of the jury was contrary to the evidence for the further reason that it ignored the following facts shown by uncontradicted testimony in the case, namely: Even if the true location of the disputed lines, according to the plat, "Exhibit X," under which the plaintiff derived title, was as claimed by the latter, the defendants claimed and derived title to the Burks tract adjoining that portion of such line A, B, C, D, E, from B to C to D under deed to their father in 1818. The metes and bounds of the Burks deed designated lines which by actual survey of Massie, as appears from his testimony above quoted, extended from B to C to D of the line A, B, C, D, E, as located on the ground along the line of said old rail fence or hedgerow. Therefore, the defendants had title, or at least color of title (with possession such as above noted according to uncontradicted testimony for defendants), older than the plaintiff's title to that portion of the strip of land in controversy lying to the west, north and northeast of said portion of said line from B to C to D. Hence, as to so much of the boundary line, and such portion of the strip of land included therein, the verdict of the jury was in the face of the uncontroverted evidence for defendants and absolutely without evidence for the plaintiff to support it, since the plaintiff must recover upon the strength of her own title—as indeed the court below correctly instructed the jury in an instruction not excepted to and hence not herein quoted.

This view of the case results in our having to reverse the action of the court below on the assignment of error under consideration, and the granting of a new trial. Ordinarily such holding would call for no further opinion from us upon the other assignments of error in the case, but as upon a new trial it seems that the following questions raised by such assignments of error will again arise and have to be passed upon by the court below, we feel constrained to deal

with them here. They will be considered in their order as they arise under the remaining assignments of error above noted.

As to—

b. The refusal of the court to admit in evidence the plat referred to above under this heading.

The court below was right in refusing to admit this plat in evidence. This plat was not referred to in or made a part of any part of the chain of title of defendants or of the plaintiff, and hence was not admissible as evidence of the extent or location of the metes and bounds covered by the true title.

For the same reasons it was not admissible on the question of the extent or location of the metes and bounds covered by the color of title of defendants. *Sulphur Mining Co.* v. *Thompson,* 93 Va. 293, 25 S. E. 232.

c. The giving of certain instructions, "A," "B," and "C," for plaintiff.

Such instruction "A" was as follows: "The court instructs the jury that where one person relies upon the acquirement of land, rightfully belonging to another, by adverse possession, such adverse possession must possess the following elements as shown by a preponderance of testimony; (1) The possession must last during the period of the statute (that is, for fifteen years prior to the institution of suit, concerning lands situated in Amherst county); (2) That such possession should meanwhile have been continuous and uninterrupted; (3) That it must be free from fraud; (4) That it should have been visible and notorious; (5) That it should have been exclusive; (6) That it should have been hostile; and (7) That it should have been actual. And, therefore, as applying to the case at bar, unless the jury believe by a preponderance of evidence that the defendants have held the land in controversy in accordance with said elements or requirements, each and every one,

then they must find for the plaintiff, so far as the acquirement of title thereto by adversary possession is concerned.

"See Minor or Real Property, Vol. II, page 1103."

1. This instruction disregarded the right of defendants · to tack their possession to the possession of those under whom they claimed and derived title. However, in view of the testimony for defendants on the trial of the case, to the effect that such possession as they proved was by themselves, the omission in the instruction of the reference to possession of those under whom they claimed title was not error.

Such instruction "B" was as follows: "The court instructs the jury that where a person occupies and possesses the land of another through a misapprehension or mistake, as to the boundaries of the land, with no intention to claim as his own that which does not belong to him, but only intending to claim to the true boundary line, wherever that may be, he does not hold° adversely, and the reason why this is so is because in this State *intention to hold adversely* is an indispensable requisite to adverse possession, and such intention is then wanting; and, therefore, if they believe from the evidence that the defendants occupied and possessed the land in controversy through a misapprehension or mistake as to the boundaries of their lands, with no intention to claim as· their own that which did not belong to them, but only intending to claim to the true line wherever that may be, they must find for the plaintiff.

"See *Schaubuch* v. *Dillemuth,* 108 Va. 86, 60 S. E. 745, 15 Ann. Cas. 825."

2. This instruction correctly expounds the law when stated in reference to a case to which it is applicable; indeed, the precise language employed in this instruction may be found used by this court in its discussion of the cases in which the rule that intention to hold adversely is an essential element of adverse possession. The error in this

instruction, as applicable to a case such as that at bar, is contained most distinctly in the concluding paragraph of it, namely: " * * * and, therefore, if they believe from the evidence that the defendants occupied and possessed the land in controversy through a misapprehension or mistake as to the boundaries of their lands, with no intention to claim as their own that which did not belong to them, but only intending to claim to the true line wherever this may be, then they must find for the plaintiff.

The proposition of law embodied in this paragraph is good and sound in principle only where the case is one where the fact is that no intention to hold adversely up to the boundary line *on the ground* in question exists or is proved. In a case of absence of proof of such intention, possession taken through a misapprehension or mistake as to the boundary of land, with proof only of a general intention to claim only what belongs to one, as may be determined by the true boundary, wherever it may be, the mistake explains the possession and there is an absence of proof of the fact that the intention to claim adversely exists. Similarly, if the possession up to a given boundary is taken under a parol agreement between adjoining land owners that the line is not the true boundary line, there is an absence of an intention to claim adversely on the part of one taking possession under such an agreement. And the cases in which there may be an absence of the intention to claim adversely, *i. e.,* where the possession may be explained as consistent with the absence of such intention, are as various and as innumerable as are the mutations of human affairs. No especial significance, therefore, is to be given to the taking of possession under a mistake as to the true boundary, nor any especial or conclusive presumption is to be inferred as resulting from it. It is merely an explanation of the character of the possession taken under such circumstances, which in the absence of proof of spe-

cific intention to claim title to a definite line *on the ground,* then or subsequently existing, negatives the idea of the existence of such intention.

On principle this is necessarily true. And to give to the fact that possession once taken, under a mistake as to the true boundary, may not in some cases, at the very time of taking possession under such mistake, be accompanied by the intention to claim title adversely, or if not at such time so accompanied, may not afterwards change its character, on the part of the original possessor, or subsequent possessor claiming under him, would be a confusion of ideas and would be to lose sight of the fact that the inquiry always, in a case of alleged adverse possession, is, with what intent is it in fact held? In other words, was it with claim of title? It is true that if originally taken under a mistake, and with the conditional intention only, above referred to, in the absence of proof of a specific intention as to the extent of the claim of title, or of a later or changed and specific intention, it will be assumed that there has been no change in the intent. What is not proved cannot be assumed to exist. It is also true that as between parties and privies a possession originally taken in subservience to another's title cannot be changed into an adverse possession without proof, not only of a subsequent specific intention to claim adversely, but such proof must go to the extent of bringing home notice of such intention to claim adversely to the owner of the dominant estate, or be of such a character that such notice will be presumed (*Creekmur v. Creekmur,* 75 Va. 430, and other cases on this subject). Still, the fact remains that, if in a given case there is proof of such specific intention to claim adversely, and there is no complication arising from the possession having been taken originally by agreement or in subservience to a dominant estate, (or, if there is such complication, the facts are such that notice of the intention to claim adversely is

brought home to the owner of such estate, or the proof as to it is of such character that such notice will be presumed), from that moment, the possession will be adverse, and the statute of limitations will begin to run, regardless of the prior absence of intent to claim adversely.

On principle no other position can be in accordance with the spirit and intent of the statute of limitations, or indeed with the strict letter of the statute. On authority we find the same to be true.

The leading case in Virginia on the subject of possession taken by mistake is that of *Davis* v. *Owen,* 107 Va. 283, 58 S. E. 581, 13 L. R. A. (N. S.) 728. In that case there was an express disclaimer, on the part of the school trustees who took the possesion relied on by the defendants as adverse, of any intention to claim title beyond the true boundary. The defendants had had only eight or nine years' possession themselves, not sufficient to apply the bar of the statute of limitations. Hence, there was in that case an absence of proof of an intention to claim adversely existing, coupled with possession, for the statutory period, and what is said by this court in that case must be read as applicable only to the case before the court.

This subject of possession taken by mistake is referred to in the case of *Haney* v. *Breeden,* 100 Va. at pp. 783-4, 42 S. E. 916, 917, and it is there made plain that in such cases the real inquiry always is whether the possession was with or without the *intention of claiming title,* this court saying: "It is true adverse possession depends upon the intention with which the possession is taken and held; and while the intention to claim title must be manifest, it need not be expressed. But whether or not the plaintiffs took possession by mistake or without the intention of claiming title is a question for the jury * * *"

In the case of *Schaubuch* v. *Dillemuth,* 108 Va. at pp. 91-2, 60 S. E. 747, 15 Ann. Cas. 825, this court said: "The evidence, considered upon the demurrer to it, mani-

festly does not sustain the defendant's claim of adversary possession. It does appear that he had exclusive possession of the land in controversy for more than fifteen years, perhaps for twenty-five or thirty years; but it does not appear that he held it under color of title or claim of right. If he held it as the grantor of his father, he held, not adversely, but in subserviency to the grantee, as there is no evidence that he ever disclaimed that relation, and asserted an adverse right, which was brought to the knowledge of his grantee or those claiming under him. If he was holding the land under the mistaken belief that the fence between the thirty-three acres and the land in controversy was the line, the evidence not only fails to show that he intended to *claim* and *hold all the land east of the fence,* whether or not it was upon the true line between his land and that which he had conveyed to his father, but it tends strongly to show that he did not occupy the land with the intention of claiming or holding to the fence unless that was upon the true line. When his attention was called to the fact, by his father's vendee, Mr. Epes (after the latter's agreement to sell his farm, which included the fifty-acre parcel, to the plaintiff, but before the purchase price had been paid and the conveyance made), that the boundary west of the fence only contained thirty-three acres, he did *not claim* that he was the *owner of the land immediately east of the fence.* On the contrary, he stated that he had sold fifty acres to his father and that Mr. Epes was entitled to that much land. He by agreement went upon the land with Mr. Epes, a surveyor named Rives, and the son of the plaintiff who represented her, to establish the line and mark the corners of the fifty-acre parcel. The surveyor, in accordance with the directions of the defendant, ran the line far enough west of the fence to make up the fifty acres called for by the defendant's deed to his father, and marked the corners and line trees

thereof. The defendant, not being entirely satisfied with the accuracy of that survey, went upon the land again with Mr. Epes and another surveyor, and at that time admitted that the survey made by Mr. Rives was practically correct." (Italics ours.)

In the case of *Clinchfield Coal Co.* v. *Viers,* 111 Va. 261, 68 S. E. 976, the plaintiff, relying on adverse possession, recognized the location of the line in controversy as claimed by the defendant as the true line "by deed of July 23, 1904, in which he unites with others in conveying to the grantee all the coal on a certain tract of land, the boundary lines called for in the deed going exactly to and no further than the" line as claimed by defendant. This was within the statutory period before the institution of the suit. It was not a case, therefore, in which the fact was that there was a specific intention proved to exist on the part of the possessor to claim title to *a definite line on the ground* in fact beyond the true line. What is said by this court, therefore, in that case must be read in the light of the case before the court. (See also *Stuart* v. *Meade,* 119 Va. 753, 89 S. E. 866.)

The cases elsewhere are not in harmony on this subject, but the conflict is more seeming than real. It is believed that the considerations on principle above suggested, and the further consideration that much of the conflict on the subject arises from the different presumptions which the courts entertain at the beginning of their reasoning as arising from the proof only of possession, without express proof of intention to claim title to a definite boundary *as located on the ground,* will go far to harmonize them.

In Virginia, proof of an expressed intention to claim title is not necessary. *Haney* v. *Breeden, supra.*

It is said in *Ross* v. *Gould,* 5 Me. (5 Greenl.) 121: "* * * a disseisin cannot be committed by mistake, because intention * * * is an essential ingredient in a disseisin."

But this assumes that there is no proof of intention to claim title beyond the boundary line as *designated in the claim of title* of the possessor—the *extrinsic* matter of the calls in the deed or other evidence of claim of title being the *controlling factor* of the intention of the possessor. Coupled with this proof there may or may not be further proof of an actual intention to claim title to *the land itself* up *to a specific boundary line on the ground,* as the *controlling factor* of the intention of the possessor. In the former case the intention to claim title would be contingent and ambulatory, dependent for definiteness of location on the ground upon the more definite ascertainment of precisely where the lines called for in the chain or claim of title should be located on the ground. In the latter case, if such further proof be present, the possessor is shown by such further proof itself to have taken a step further in his mental process and to have decided for himself, then and there, without waiting for any future more definite ascertainment thereof, that the lines called for in his chain of title have in fact a definite *locus* on the ground, which he then and there fixes upon definitely and claims title up thereto. It is true that in taking such definite action he may be mistaken in his location as compared with the true location of the lines called for in his chain or claim of title. It may be true that but for such mistake he would never have taken the further step of forming the definite intention to claim title up to the definite location of the line in question on the ground; but the fact exists that he did form such definite intention. In such case, if he has no other claim of title than his true title, he has no color of title to give him constructive possession beyond the true boundary line. But he may, nevertheless, take and hold possession by *pedis positio* or actual possession beyond his true boundary line, and with such *bona fide,* though mistaken, claim of title to the extent of such *pedis positio* or

actual possession, he will have adverse possession, which if continued unbroken for the statutory period will ripen into a perfect title under the statute of limitations. (See *Creek-mur* v. *Creekmur, supra; Kincheloe* v. *Tracewell,* 11 Gratt. (52 Va.) 587, 685; *Reusens* v. *Lawson,* 91 Va. 236, 21 S. E. 347; *Shanks* v. *Lancaster,* 5 Gratt. (46 Va.) 110, 50 Am. Dec. 108; *Drumright* v. *Hite,* 2 Va. Dec. 465, 26 S. E. 583—as to general subject of the character of claim of title which may support adverse possession in Virginia.) Otherwise the statute of limitations would not run in favor of possession under a *bona fide* claim of title when possession is taken beyond the bounds of the true title, and no honest man could acquire title under such statute. His very honesty and *bona fides* would rob him of the benefit of the statute. As is aid in *Cole* v. *Parker,* 70 Mo. 372: "Honest men always inclose land not their own by mistake, or with the consent of the owner, and if the law on this subject were not as this court has held, the statute of limitations would never run in favor of an honest man, because he would never avow his purpose to have been to take the land of another."

As is said in *French* v. *Pearce,* 8 Conn. 439, 445, 21 Am. Dec. 680, "the intention of the possessor to claim adversely is an esential ingredient * * * yet * * * the person who enters on land believing and claiming it to be his own * * * though under a mistake, * * * does thus enter and possess. The very nature of his act is an assertion of his own title and the denial of the title of others. * * * it is certain that a disseisin may be committed by mistake as that a man may, by mistake, take possession of land, claiming title and believing it to be his own. * * * Adopt the rule that an entry and possession under claim of right, if through a mistake, does not constitute an adverse possession and a new principle is substituted. The inquiry no longer is whether visible possession, with the intent to possess

under a claim of right, and to use and enjoy as one's own is a disseisin; but from this plain and easy standard of proof we are to depart, and the invisible motives of the mind are to be explained * * *."

In *Seymour* v. *Carli*, 31 Minn. 81, 84, 16 N. W. 495, 496, after conceding that the parties, when possession was taken, made a mistake as to their boundaries, the court said: "The object of the statute is to quiet titles and end disputes. If the plaintiffs have a cause of action in ejectment, there would seem to be no good reason why the statute should not run against it, as in other cases where the possession of land is withheld. It is the policy of the law that parties should assert their claims to the possession of land and rectify their boundaries within the statutory term."

A collection of many recent cases on this subject will be found in the note of the learned annotator to 33 L. R. A. (N. S.) 923, *et seq.*, where the varying views of the different courts in recent cases will be found. The conclusion of the annotator is that, "the old idea that there could be no disseisin by mistake is now abandoned," and that "the trend of opinion is against disturbing him whose visible boundarises have existed for the period of the statute of limitations."

On the whole, the correct rule, and the rule in Virginia, may be taken to be that, where the proof is that the location of the line in question was caused in the first instance by a mistake as to the true boundary, the other facts and circumstances in the case must negative by a preponderance of evidence the inference which will otherwise arise that there was no definite and fixed intention on the part of the possessor to occupy, use and claim as his own the land up to a particular and definite line on the ground. That is to say, on the whole proof a case must be presented in which the preponderance of evidence as to the character of the possession, how held, how evidenced on the ground,

how regarded by the adjoining land owner, etc., etc., supplies the proof that the definite and positive intention on the part of the possessor to occupy, use and claim as his own the land up to a particular and definite line *on the ground* existed, coupled with the requisite possession, for the statutory period, in order to ripen title under the statute. Whether the positive and definite intention to claim *as one's own* the land up to a particular and definite line *on the ground* existed, is the practical test in such cases.

The collateral question whether the possessor would have claimed title, claimed the land as his own, had he believed the land involved did not belong to him, but to another, that is, had he not been mistaken as to the true boundary line called for in his chain of title, is not the proximate but an antecedent question, which is irrelevant and serves only to confuse ideas.

The verdict of the jury in the case at bar is an illustration of the effect that results from a confusion of the circumstance that there was a mistake in the original location of the lines in controversy (if there was in fact such a mistake, which would be but a single circumstance after all, which should have been considered by the jury in determining whether the fact of an intention to claim title up to such boundary lines existed in the possessor for the requisite statutory period) with the broader consideration of whether on the whole case the evidence shows that such intention to so claim title existed. That is to say, it seems clear that the jury, under the instruction under consideration, drew from the presumption that arises from such a single circumstance, a conclusive inference that in such a case no intention to claim title to the boundary as located on the ground could at any time exist. This was to base an inference upon a presumption, which this court has held in another line of cases cannot be done. (*C. & O. Ry. Co.* v. *Heath,* 103 Va. 64, 48 S. E. 508.) And under such

instruction the verdict of the jury ignored the uncontradict-
ed testimony in the case referred to above, which was in ef-
fect that defendants had for the greater part of seventy
years in fact claimed title, claimed as their own the land, up
to the old rail fence and hedgerow location *on the ground* of
the lines in controversy with the knowledge thereof on the
part of, and hence brought home to, the adjoining owners,
under which plaintiff claims, at least up to the time of her ac-
quisition of the title, a claim of title which would have
sufficed to apply the bar of the statute of limitations as
against such adjoining owners even had the defendants'
possession been originally taken in subservience to the title
of such owners (*Creekmur* v. *Creekmur, supra,* and kin-
dred cases too numerous to cite). If such could be the law
in this State, few titles would be secure from experimental
surveys based upon the calls for courses and distances of
ancient plats, in disregard of long established boundaries
in accordance with actual possession taken and held for
the prescriptive period, or longer, without objection on the
part of adjoining land owners. It is true that courts have
no policies, but they know that the policy of the statutes
of limitations is one of repose, and this court would feel
that a construction of this statute which would nullify its
policy would not be a correct construction of it.

Our conclusion, therefore, is, on the instruction "B" un-
der consideration, that the court below erred in giving it
in this case; and that while its language is abstractly cor-
rect as applicable to a proper case therefor, it would be a
better practice in any case for any instruction or instruc-
tions on this subject to be in a different form, so as to
present for the consideration of the jury, in dealing with
this subject, the main and broad question, whether the in-
tention to claim title—to *claim as his own* the land—up
to the line or lines in controversy *on the ground* in fact
existed, along with the acts of possession relied on by the

possessor, and direct their attention to the consideration of mistakes in original location of boundary, if such was made, as but one of the circumstances, if there are others, which bear upon such question of fact as to intention to claim title.

Instruction "C" was as follows: "The court instructs the jury that while the quantity of land mentioned in the deed will not control the boundary when estimated by the description, nevertheless a correspondence of quantity given by a line in question with the quantity mentioned in the deed or in the approximation thereto, may be considered as going to establish such line as the true one."

3. We think that this instruction gave too great prominence and weight to the mere acreage. Instead of instructing the jury that the quantity of land may be considered "as going to establish such line," it would have been better for the court to have said it may be considered "as a circumstance bearing upon the establishment of such line, but one of less weight than natural monuments or corners or reputed boundaries called for in the plat, 'Exhibit X' filed with the plaintiff's petition in this case."

Instruction "D" was as follows: "The court instructs the jury that if they believe, in the light of all of the evidence, that the boundary lines between the parties hereto have been properly determined and laid off by Mr. H. G. Garland, the surveyor appointed by the court to make the survey herein filed, in accordance with the plots and metes and bounds attached to or referred to in deeds and other muniments of title under which said parties claim their respective rights and title to the lands in question as introduced in this case, then the court further instructs the jury that if they believe from the evidence that these lines have by mistake of the parties hereto or their grantors or predecessors in title become confused so that the defendants have in consequence taken possession of a part of the land

shown by said survey as properly belonging to the plaintiff, then unless the jury believe from the evidence that the defendants or their predecessors in title have intentionally dispossessed the plaintiff or her grantors for the purpose of acquiring title by adversary possession to all or a part of the land in question, then they, the jury, should find for the plaintiff in accordance with the report and survey of Mr. H. G. Garland filed in this suit."

It is deemed sufficient in this case to say—

4. We think that this instruction is erroneous because of its adoption of a wrong view of the effect of a mistake in the original location of boundary lines, as above set forth.

We come now to consider—

d. The refusing of certain instructions numbered 1 to 7 offered by defendants.

1. As this opinion has been sufficiently prolonged, it is deemed sufficient to say on this subject that all of these instructions were properly refused, it appearing from the record that the other instructions given for the defendants fairly submitted their theory of the case to the jury.

We have not reviewed the cases of *Hamman* v. *Miller*, 116 Va. 873, 83 S. E. 382, and *Wright* v. *Rabey*, 117 Va. 884, 86 S. E. 71, because they are not directly in point upon any of the questions involved herein; but the manner in which the statute in question was dealt with in those cases tends to support the conclusions reached in the present case.

For the reasons stated above, we are of opinion to reverse the judgment complained of, set aside the verdict of the jury, and grant a new trial, to be had not in conflict with the views above expressed.

*Reversed.*