Staunton.

JEFFRIES AND OTHERS V. COMMONWEALTH.

September 20, 1917.

Absent, Sims, J.

1. CORPORATIONS—*Voluntary Dissolution of Public Service Corporations.*—A public service corporation, created and existing under the laws of this State has, under those laws, the same right of voluntary dissolution which is accorded to all other business corporations.

2. CONSTITUTION — *Construction—Corporations—Voluntary Dissolution of Public Service Corporations.*—The Constitution of 1902, section 154, provides that: "Provision shall be made, by general laws, for the voluntary surrender of its charter by any corporation, and for the forfeiture thereof for non-user or misuser." This section in terms embraces corporations of every class, public service corporations as well as others, and there is no satisfactory reason for resorting to rules of construction to construe this language which, in itself, is so conspicuously clear.

3. CORPORATIONS—*Voluntary Dissolution of Public Service Corporations—Power of Legislature.*—The form and wisdom of the method of voluntary surrender of corporate franchises are matters which were expressly delegated to the legislature by the terms of the Constitution, and as to them neither the Corporation Commission nor the Supreme Court of Appeals can have any controlling voice.

4. CORPORATIONS—*Voluntary Dissolution of Public Service Corporations—Power of Legislature.*—Code of 1904, section 1105-e, chapter 5, subsection 1, of the act concerning corporations, which provides that, "the provisions of this chapter, except in those cases where, by the express terms of the provisions hereof, it is confined to corporations created under this act, shall be construed to apply to all corporations of this State organized or to be organized for any lawful purpose for which a corporation may be created under this act," is not to be construed as declaring merely that corporations created outside of the act were to be affected just as much as those that were created

54

under the act, and as referring to private corporations only in each instance; that the subsection plainly intends to embrace *all* corporations, affirmatively appears from the language of subsection (2) (a) and (2) (h), wherein the terms "charter," "certificate of incorporation" and "articles of association" are used. The legislature evidently meant to designate by the term "charter" corporations already existing, and by the terms "certificate of incorporation" and "articles of association" corporations created under the act.

5. PUBLIC SERVICE CORPORATIONS—*Suspension of Corporate Functions.*—Public service corporations, so far as the general public is concerned, may always suspend their corporate functions in part or in whole, temporarily or finally, with the consent of the State.

6. CORPORATIONS—*Dissolution of Public Service Corporations.*—It was contended that subsection 30 of section 1105-e, as originally enacted, did not refer to public service corporations and that the subsection in its present amended form (Acts 1906, p. 576), contains no broader terms than the original, and therefore cannot be applied to a new class of corporations, but the history of the subsection, and the provisions of other statutes *in pari materia* with it, so far from furnishing any sound argument in support of the claim that it applies only to private corporations, are directly and convincingly to the contrary.

7. CORPORATIONS—*Voluntary Dissolution of Public Service Corporations—Section 1105-e, Subsection 30, Code of 1904, and Section 1294-b, Subsection 16, Code of 1904.*—There is nothing in subsection 1294-b (16), Code 1904, which cannot be acted upon in perfect harmony with everything in 1105-e (30), Code 1904, in its original form; and while both sections, so far as they affected public service corporations, might not have been necessary for the common purpose of each (which was the direction of the disposition of assets), it is to be observed that neither of them provided in terms for a method whereby a corporation might surrender its charter. Therefore, there is no force in the contention that section 1105-e, section 30, Code of 1904, in its orignial form, could not have referred to public service corporations, because section 1294-b, section 16, Code of 1904, relating exclusively to public service corporations, was written into the statute law of the State at the same time with the original of subsection 30.

8. CORPORATIONS—*Dissolution of Public Service Corporations—Section 1105-e, Subsection 30, Code of 1904.*—At the time of the amendment to section 1105-e, subsection 30, Code of 1904, by

Acts of 1906, p. 576, provision had been made by statute for the voluntary dissolution of private business corporations and for corporations having no capital stock, but no provision had been made for the voluntary dissolution of public service corporations. The amendment was so drawn as necessarily to embrace in its terms all corporations, and the only reasonable purpose which can be attributed to the action of the legislature in adopting the amendment, is a purpose to complete, by a general and uniform law applicable to all corporations, the work which had been assigned to it by the Constitution.

9. CORPORATIONS—*Voluntary Dissolution of Public Service Corporations.*—Subsection 12 of section 1294-b, Code of 1904, relating to the sale under a deed of trust of the franchises and property of a corporation; subsection 15 of section 1294-b, Code of 1904, relating to such a sale under the decree of a court; and subsection 58 of section 1313-a, Code of 1904, relating to proceedings by *quo warranto* in the event of nonuser or misuser by a corporation organized for works of internal improvement, in no way deny the right of a public service corporation to voluntarily dissolve as prescribed by subsection 30, section 1105-e, Code of 1904.

10. STATE CORPORATION COMMISSION—*Powers—Corporations Intending to Dissolve.*—The State Corporation Commission exists and derives all its powers from the Constitution and statute laws of the State; and there is no word or hint in the Constitution and statutes passed pursuant thereto which shows that the visitorial and inquisitorial powers conferred upon that body have any relation whatever to corporations intending to dissolve and cease to do business as such. These powers plainly relate to going concerns.

11. CORPORATIONS—*Voluntary Dissolution—Power of State Corporation Commission.*—Code 1904, section 1105-e, subsection 2, i, which authorizes a corporation "to wind up and dissolve itself in the manner provided in this act," applies to public service corporations, and subsection 30 of section 1105-e, Code of 1904, prescribes the manner, leaving only a ministerial function in regard thereto with the commission.

12. CORPORATIONS—*Voluntary Dissolution of Public Service Corporations—Constitutionality of Section 1105-e, Subsection 30.*—Subsection 30 of section 1105-e, Code of 1904, providing for the voluntary dissolution of corporations is not unconstitutional when extended to public service corporations as unduly curtailing the powers of the State Corporation Commission. The commission must look to the Constitution and laws pursuant thereto for its powers, and the powers therein conferred

do not extend beyond the control and regulation of corporations continuing to hold on to and exercise their corporate franchises.

13. CORPORATIONS—*Constitutional Law—Section 154 of the Constitution.*—Section 154 of the Constitution of 1902, provides for the creation, extension and amendment of charters of every kind, under general laws to be enacted by the General Assembly; the preservation of the right of repeal by the State; and the delegation to the General Assembly of the power and duty of providing, as it might see proper, but by general laws, for the voluntary surrender of the charter of any corporation, regardless of its class—a reservation to the State of the power of repeal, and a consent by the State to a voluntary dissolution. This section of the Constitution cannot be construed so as to exclude public service corporations from the direction in regard to voluntary dissolution, unless they are also excluded from the operation of every other part of the section.

14. PUBLIC SERVICE CORPORATIONS—*Interest of the Public*—Charters of incorporation are contracts between the incorporators and the State. The public has an interest in public service corporations, but it does not own them. Private property invested in a railroad enterprise becomes impressed with a public service, but still remains the property of the stockholders and cannot be confiscated. The public has never yet been held to have a vested right in the perpetual operation of a railroad or other public service corporation.

15. STATUTES—*Constitutional Law—Object Should be Expressed in Title—Mandatory Act.*—Subsection 30 of section 1105-e, Code of 1904, as amended Acts of 1906, page 576, is not unconstitutional as violating section 52 of the Constitution, providing that no law shall embrace more than one object, which shall be expressed in its title. The act which amended subsection (30) of chapter 5 was entitled, "An act to amend and re-enact section (30) of chapter 5 of an act entitled an act concerning corporations, which became a law on the 21st of May, 1903" (Acts 1906, page 576). The title of an act amending the Code is sufficient if it refers to the chapter and sections to be amended and the body of the amendatory act is within itself germane to the subject of the chapter referred to in the title.

16. STATUTES—*Constitutional Law—Object Should be Expressed in Title—Mandatory Act.*—Wherever the title of the original act sufficiently complies with section 52, Constitution of 1902, the title of subsequent amendatory acts is a matter of no consequence.

17. CORPORATIONS — *Dissolution of Public Service Corporations —
State Corporation Commission—Issuance of Certificate.*—The
issuing to a public service corporation a certificate of disso-
lution, as provided for in subsection 30, section 1105-e, Code of
1904, by the State Corporation Commission, is a ministerial
and not a judicial function, and the argument that the func-
tion in question is too important to· be a ministerial act is
readily answered by the terms of the Constitution and statutes
relating to the tremendously important subject of the creation
of corporations, as to which the commission can only act min-
isterially.

18. CORPORATIONS—*Dissolution of Public Service Corporations—
Jurisdiction—Application for Receiver.*—Upon the filing of a
certificate of unanimous consent of stockholders to the disso-
lution of a corporation, as provided by section 1105-e, subsec-
tion 30, Code of 1904, with the State Corporation Commission,
the sole question before that body was whether the com-
pany had complied with the law entitling it to a certificate
of dissolution. If it had, it was the duty of the commission to
issue the certificate, and no court (except on appeal) could
enter any order that would "interfere with the commission in
the performance of its official duties." And the appointment
of a receiver for the corporation between the filing of the cer-
tificate of consent and its final amendment as to signature
and execution, is no reason· for refusing a certificate of disso-
lution, if otherwise it should have been granted.

Appeal from an order of the State Corporation Commis-
sion, refusing to issue a certificate of dissolution of a cor-
poration upon an application by the stockholders.

*Reversed.*

The opinion states the case.

*E. Randolph Williams* and *B. Rand. Wellford,* for the ap-
pellants.

*Attorney-General Jno. Garland Pollard, Assistant Attor-
ney-General Leslie C. Garnett, Leon M. Bazile, C. V. Mere-
dith, Willis B. Smith, J. E. Cannon, Haskins Hobson, M.
P. Bonifant, W. M. Smith* and *W. M. Justis, Jr.,* for the
Commonwealth and others.

KELLY, J., delivered the opinion of the court.

The paramount question in this case is whether public service corporations created and existing under the laws of this State have, under those laws, the same right of voluntary dissolution which is accorded to all other business corporations. The constitutional and statutory provisions on the subject seem to us to plainly answer the question in the affirmative.

"The creation of corporations, and the extension and amendment of charters (whether heretofore or hereafter granted) shall be provided for by general laws, and no charter shall be granted, amended or extended by special act, nor shall authority in such matters be conferred upon any tribunal or officer, except to ascertain whether the applicants have, by complying with the requirements of the law, entitled themselves to the charter, amendment or extension applied for, and to issue, or refuse, the same accordingly. Such general laws may be amended or repealed by the General Assembly; *and all charters and amendments of charters,* now existing and revocable, or hereafter granted or extended, *may be repealed at any time by special act. Provision shall be made, by general laws, for the voluntary surrender of its charter by any corporation, and for the forfeiture thereof for non-user or mis-user.* The General Assembly shall not, by special act, regulate the affairs of any corporation, nor, by such act, give it any rights, powers or privileges." (Italics added.) Virginia Constitution, 1902, sec. 154.

It is under this section of the Constitution that the General Assembly has proceeded to enact the general laws now in force in this state regarding the creation of corporations, their division into classes, the amendment and extension of their charters, and the corporate powers, privileges and limitations. That the section in terms embraces corporations of every class is so plain that no argument to prove the proposition could make it plainer, and none to disprove it could raise a question in any reasonable mind. This we

believe to be either directly or indirectly conceded in the multiform arguments presented in this cause for the purpose of placing upon the section a construction which would except public service corporations from the operation of the provision therein directing the General Assembly to provide "by general laws for the voluntary surrender of its charter by any corporation." All such arguments come, as they manifestly must come, from considerations outside of the plain language selected by the framers of the Constitution in their well known care and purpose to clarify and unify the corporation laws of the State. These extraneous arguments will be considered in the further course of this opinion. It is sufficient in this immediate connection to say that we have been unable to regard them as of any convincing force. We are constrained to accept the section as it stands, and believe that no satisfactory reason has been shown for resorting to rules of construction to construe the language which, in itself, is so conspicuously clear. (See authorities cited by Judge Prentis in *London Bros.* v. *National Exchange Bank of Roanoke*, 93 S. E. 699, decided at this term.)

Taking the Constitution, therefore, at its word, it is to be expected that the General Assembly has obeyed its mandate and has provided by general laws for the voluntary surrender of the charter of any corporation, regardless of its class; and the next orderly step is to inquire whether that body has done so—not how well or how wisely. The form and wisdom of the method of voluntary surrender of corporate franchises are matters which were expressly delegated to the legislature by the terms of the Constitution, and as to them neither the Corporation Commission nor this court can have any controlling voice.

Coming then to a consideration of what the legislature has done in this respect, we find that in addition to the special powers conferred and restrictions imposed on rail-

road corporations (the one involved in this case belonging to that class) in chapter 2 of the Virginia "act concerning corporations," it is provided that they "shall have all the general powers and be subject to all the general restrictions conferred and imposed on corporations by chapter 5 of this act and the laws of this State relating to corporations so far as applicable thereto." Code, section 1105-b, subsection (2).

Chapter 5 of the act (section 1105-e, Pollard's Code, 1904) provides, in subsections (1) and (2), as follows:

"(1) The provisions of this chapter, except in those cases where, by the express terms of the provisions hereof, it is confined to corporations created under this act, *shall be construed to apply to all corporations of this State organized or to be organized for any lawful purpose for which a corporation may be created under this act,* but shall not be construed to enlarge the powers of corporations chartered under chapter four of this act.

"(2) Every corporation of this State shall have power:

"(a) To have succession for the time stated in its *charter, certificates of incorporation, or articles of association.* But when no period is so limited, it shall be perpetual, subject to the power of repeal reserved by the Constitution to the General Assembly," and, further,

"(i) *To wind up and dissolve itself, or to be wound up and dissolved in the manner provided in this act.*" (Italics added.)

One of the contentions in this case, which may be most conveniently adverted to just here, is that even if public service corporations are embraced in the direction contained in section 154 of the Constitution with reference to the enactment of general laws for the voluntary surrender of charters, still subsection (1) of 1105-e does not mean to include such corporations in all the provisions in chapter 5 of the act, but simply meant to declare that corporations

created outside of the act were to be affected just as much as those that were created under the act, and was referring to private corporations in each instance. The first and natural impression to be obtained from a reading of the language of subsection (1) is directly to the contrary of this contention, and the language must be considerably strained to give any color at all to the argument. That it has no such meaning as is here contended for, and plainly intends to embrace *all* corporations, affirmatively appears from the language of subsections (2) (a) and (2) (h), wherein the terms "charter," "certificate of incorporation" and articles of association" are used. The legislature evidently meant to designate by the term "charter" corporations already existing, and by the terms "certificate of incorporation" and "articles of association" corporations created under the act. Considering the nomenclature of the act, these are apt, if not necessary, terms for that purpose, and they were plainly so used.

The specific statute with which we are concerned in this case is subsection (30) of the same chapter (Code, section 1105-e), in which it is provided that "whenever, in the judgment of the board of directors, it shall be deemed advisable and for the benefit of any corporation organized under this act, or under any charter heretofore granted by any court, or by the General Assembly of Virginia, that it shall be dissolved," the board may take certain steps therein provided, which, if two-thirds in interest of the stockholders shall consent, will result in a voluntary dissolution and a settlement of the affairs and business of the corporation by the board of directors; and it is therein further provided that *"whenever* all of the stockholders shall consent to the dissolution, no meeting or notice thereof shall be necessary, but on filing the said consent in the office of the State Corporation Commission, the said commission shall issue a certificate of dissolution, *and the said corporation shall there-*

*upon stand dissolved, and the said board shall proceed to settle up and adjust the business and affairs of the said corporation;* provided, however, that no such dissolution shall affect the rights of any creditor of the said corporation existing at the time of such dissolution." ·(Italics added.)  Acts 1906, chapter 327.

The appellants in this case, being all of the stockholders of the Tidewater and Western Railroad Company, which obtained its charter from the Corporation Commission in 1905, filed their unanimous consent to the dissolution of that corporation with the State Corporation Commission. This consent was certified in accordance with the provisions of subsection (30), upon a form prescribed by the State Corporation Commission for the voluntary dissolution of corporations, similar to those which had theretofore been prescribed by the commission for use by stockholders intending to bring about a voluntary dissolution of corporations, regardless of whether they were public or private in their nature.  Some question is made as to the exact date when this consent in duly executed form was presented to the commission, but this question is of altogether minor importance.  It is sufficient for the purposes of this case and in this connection to say that the certificate, as first presented to the commission on May 10, 1917, was genuine in the authorization of the signatures thereto, and was true in its certification of the previously given unanimous consent of the stockholders; and that it was accepted by the chairman of the commission as being in all respects in due form on May 17, 1917.

A number of persons, including the boards of supervisors of Powhatan and Cumberland counties, all claiming to be interested in and affected by the proposed dissolution, asked leave to file their petitions protesting against the granting of the certificate of dissolution; and, the matter having been formally presented and heard before the commission,

that body, on the 5th of June, 1917, entered an order rejecting the petitions of the intervenors, but also refusing to issue the certificate.

In this result, Honorable Christopher B. Garnett, chairman, and Honorable J. R. Wingfield, commissioner, concurred. The remaining member of the commission, Honorable Wm. F. Rhea, dissented. All three of the commissioners filed written opinions, setting out at some length the reasons for their respective conclusions. The chairman of the commission did not directly pass upon the question whether subsection (30) of section 1105-e applied to public service corporations, but held that, if it did, other general provisions in the Constitution and the common and statute law of the State of Virginia must be so construed as to give the Corporation Commission the right to withhold the certificate until, in its judgment, it was satisfied that the dissolution ought to be permitted. Commissioner Wingfield concurred in the result, but rested his opinion mainly upon the proposition that subsection (30) was unconstitutional because in its present amended form the title of the act amending the same was in violation of section 52 of the Constitution, providing that "no law shall embrace more than one object, which shall be expressed in its title." Commisioner Rhea dissented on the ground that the constitutional and statutory provisions on the subject were plain and mandatory, that the function of the commission was purely ministerial in respect to the voluntary dissolution of corporations, and that the commission had no discretion or authority to inquire into the facts and circumstances prompting the stockholders in bringing about the dissolution. No reference is made to section 154 of the Constitution in either of the opinions supporting the majority view of the commission, and in neither is there any claim that the statutes we have quoted do not in terms, and standing alone, embrace corporations of every class. The

arguments advanced to support the conclusion, both in the opinions themselves and in the briefs of counsel, as previously observed, all proceed from extraneous sources and considerations. The dissenting opinion takes section 154 of the Constitution as the starting point, and regards the statutes in question as the natural outgrowth of that supreme authority and mandatory direction.

We have given to the vast array of authorities cited by the commissioners and by counsel to support the view that public service corporations may not voluntarily and arbitrarily suspend or withdraw their public service, the careful consideration which the importance of the subject and the earnestness and ability of those presenting that view demand. They deal, however, with perfectly familiar principles, and we fail to find therein anything in conflict with the conclusion that public service corporations may, under the laws of this State, voluntarily surrender their charters and cease to do business. Those authorities, in the main if not entirely, relate to corporations not intending to dissolve and go out of business altogether, but to those proposing to suspend only in part the exercise of some particular public service which they have undertaken, still holding on to their corporate franchises; and, even so, the clear result from such authorities as a whole is that public service corporations, so far as the general public is concerned, may always suspend their corporate functions in part or in whole, temporarily or finally, *with the consent of the State.* It is abundantly safe to say, unless for fear of stating what ought to go without saying, that all the authority for the proposition that such corporations may not on their own accord cease to exist, presupposes the absence of consent to that course by the State which created them. This principle, indeed, is necessarily conceded in the contention that if subsection (30) of section 1105-e applies to railroad companies, the dissolution cannot be per-

fected until the Corporation Commission has been satisfied that good reason for it exists. If the commission has the power to give consent, it has such power only as the *alter ego* of the State; and the fault in the argument lies in the failure to observe that in this instance the State, through its Constitution and statutes, has given the consent by a general and uniform law applicable to all corporations, and has left no discretion with the commission in regard to it.

Bearing in mind what all must concede, that the law-making power in the State may always provide, in such manner and upon such terms as it may deem best, for the voluntary dissolution of corporations of every kind, it is difficult to see how this power could have been more plainly conferred than has been done in the language of the statutes already quoted; and this conclusion does not become less apparent upon a consideration of the reason urged to the contrary.

(1) The one common ground upon which the advocates of the decision appealed from unite in their arguments is the assumption that it would be unwise and unsafe to permit public service corporations to dissolve without some notice to the public and some inquiry into the circumstances. They have realized, however, that before this consideration can be brought into play as an aid to the construction of the constitutional and statutory provisions which we have discussed, they must show some other constitutional or legislative declarations indicating that the former provisions, despite their plain terms, were not intended to mean what they say; since, if they do mean what they say, that is the end of the inquiry, the very questions of expediency and prudence having been expressly delegated to and finally passed upon by the legislature. With a view, therefore, to showing that the provisions of section 154 of the Constitution and 1105-e, subsection (30) of the Code were not intended to embrace public service corpora-

tions, in so far as they authorize a voluntary dissolution without notice to or investigation by some representative of the public, a great variety of contentions have been urged upon us. These contentions are too numerous and too diverse to be discussed fully and in detail in an opinion of reasonable length. We shall endeavor to deal with those upon which special reliance seems to be placed. It may be said to be significant, however, that the learned counsel who oppose the issuance of the certificate of dissolution have not agreed upon any one contention which they have seemed to regard as satisfactory and decisive. If we are to decide that the framers of the Constitution and the members of the general assembly, in dealing with a matter peculiarly within their province and power, so clearly said one thing when they meant another, it would seem that there ought to be some patent and convincing reason, readily recognizable by everybody, upon which to base the decision.

(2) A leading contention urged upon us is that subsection (30) of 1105-e, as originally enacted, did not refer to public service corporations and that the subsection in its present amended form contains no broader terms than the original, and therefore cannot be applied to a new class of corporations. We do not think the premise for this argument is correct, nor, if it were, that the conclusion from it would follow as claimed. The history of the subsection, and the provisions of other statutes *in pari materia* with it, so far from furnishing any sound argument in support of the claim that it applies only to private corporations, are directly and convincingly to the contrary.

The terms of the subsection, so far as material, have already been quoted. They were embraced in an extensive amendment made by the act of March 20, 1906 (Acts 1906, p. 576). The original was as follows:

"All corporations, whether they expire by their own limitation or are otherwise dissolved, shall, nevertheless, be continued for such length of time as may be necessary from such dissolution or expiration for the purpose of prosecuting and defending suits by or against them, and of enabling them gradually to settle and close their business, to dispose of and convey their property, and to divide their capital, but not for the purpose of continuing the business for which said corporation shall have been established."

The contention under consideration is that this section in its original form could not have referred to public service corporations because section 1294-b (16), one of the sections found in chapter 54-a of the Code, relating exclusively to public service corporations, was written into the statute law of the State at the same time with the original of subsection (30), and that as section 1294-b (16) provided specially for winding up the affairs of a defunct or dissolved public service corporation, the legislature could not have had such corporations in contemplation in the enactment of subsection (30) in its original form. We think, however, that there is no conflict or inconsistency between these two sections. There is nothing in subsection 1294-b (16) which cannot be acted upon in perfect harmony with everything in 1105-e (30), in its original form; and while both sections, so far as they affected public service corporations, might not have been necessary for the common purpose of each (which was the direction of the disposition of assets), it is to be observed that neither of them provided in terms for a method whereby a corporation might surrender its charter. The duty to do the latter had been delegated to the legislature. In section 1294-b (16) it had undoubtedly contemplated the expiration of public service corporations by limitations in their charters or by a dissolution thereof without any further continuation of the business. In chapter 1 of the "act concerning cor-

porations" the legislature, Code, section 1105-a (11), had made practically the same provision for the voluntary dissolution of private business corporations as was written into the amendment of section 1105-e (30). Indeed, the chairman of the commission says that "the purpose of the amendment was to write into chapter V provisions similar in effect to those already applicable to private corporations in section 11 of chapter 1;" and Commissioner Wingfield says that the eleventh section of chapter 1 "is imported bodily into" the amendment. But why any purpose to import and write this section into chapter five by an amendment? The importation was useless and meaningless unless it was done to provide for a voluntary dissolution by public service corporations (under chapters 2 and 3), as to which no method or form of procedure for that purpose had been prescribed. When it is recalled that at the time this amendment was passed its leading provisions were already embodied in section 11 of chapter 1, relating to private business corporations; that there was no such provision in either chapter 2 or chapter 3 (secs. 1105-b and 1105-c) relating to public service corporations; that there was a kindred but different provision (1105-d, 8), chapter 4, relating to corporations having no capital stock; and that the amendment is so drawn as necessarily to embrace in its terms all corporations, as well under chapters 2, 3 and 4 as under chapter 1, the only reasonable purpose, as it seems to us, which can be attributed to the action of the legislature in adopting the amendment is a purpose to complete, by a general and uniform law applicable to all corporations, the work which had been assigned to it by the Constitution. We can see no inconsistency between 1294-b (16) and 1105-e (30), nor between the latter and 1294-b (12), 1294-b (15), or 1315-a (58), further mentioned below; but we cannot understand how the legislature could have

passed 1105-e (30) in its amended form without expressly intending to embrace public service corporations in its terms.

(3) Closely related to the contention just disposed of is the argument that subsection (30), both in its original and present form, cannot be held to embrace public service corporations because there are sundry other provisions in our laws relating to the dissolution of such corporations. Thus it is said that subsection (12) of section 1294-b, relating to the sale under a deed of trust of the franchise and property of the company, expressly contemplates and provides for a continuation of the business by a new corporation to be formed by the purchaser; that the same is true of subsection (15) of 1294-b, relating to such a sale under the decree of a court; and that the same is true of subsection (58) of 1313-a, relating to proceedings by *quo warranto* in the event of non-user or mis-user by a corporation organized for works of internal improvement. Not one of the provisions in any of these statutes, however, in any way denies the right of a public service corporation to voluntarily dissolve in the manner provided for in the act. The end in view in all of them is necesarily dependent upon the finding of some purchaser who is willing to assume the burden and accept the privileges of the franchise offered for sale thereunder. When these provisions are read in connection with subsection (16) of 1294-b and subsection (30) of 1105-e, it becomes manifest, as we think, that the legislature simply intended to encourage, and, as far as possible, provide for the reorganization of defunct and dissolved corporations by new capital, but had no idea of denying to public service corporations the right to voluntarily dissolve.

(4) Another and most insistent contention is that to permit the voluntary dissolution of a railroad or other public service corporation would, to a large extent, nullify the

power conferred upon the Corporation Commission to regulate and control corporations of that character. The commission exists and derives all its powers from the Constitution and statute laws of the State; and there is no word or hint in the Constitution and statutes passed pursuant thereto which shows that the visitorial and inquisitorial powers conferred upon that body have any relation whatever to corporations intending to dissolve and cease to do business as such. These powers plainly relate to going concerns. If they ought to have been extended further, the remedy lies with the source of the authority. The same argument here made would extend to banking and insurance and any other private corporations over which the commission now has or may hereafter be given visitorial powers; and yet there is and can be no claim that, as the law now stands, any private business corporation may not voluntarily and without notice surrender its charter and go out of business. In all such cases, so far as creditors and outstanding contracts are concerned, the jurisdiction remains, where it always has been, with the courts.

This argument based upon the constitutional powers of the commission goes so far as to insist that if section 1105-e, subsection (30), was intended to confer on public service corporations the power to dissolve voluntarily, the subsection can only be given a conditional and qualified effect, dependent upon notice to the public and discretionary action by the commission. It is clear, however, that the statute must be taken as it is and as a whole, and not accepted in part and rejected in part. If it applies at all, then the corporation is given the power, under 1105-e (2), i, "to wind up and dissolve itself in the manner provided in this act;" and 1105-e (30) prescribes the manner, leaving only a ministerial function in regard thereto with the commission. But it is said that if this be the case, the subsection is unconstitutional because it would unduly curtail the pow-

ers of the commission. This, we think, is answered in the observation already made that the commission must look to the Constitution and laws pursuant thereto for its powers, and that the powers therein conferred do not extend beyond the control and regulation of corporations continuing to hold on to and exercise their corporate franchises. This is manifest, as we think, from the very language of the constitutional and statutory provisions upon which the argument under consideration is based; and the question is conclusively settled by the specific direction contained in section 154 of the Constitution, that the legislature shall provide by general laws for the surrender of the franchise of any corporation. We cannot exclude public service corporations from this latter direction, unless we also exclude them from every other part of section 154; and to do this we would be brought to the necessity of deciding that the Constitutional convention of 1901-2, after all its labor and pains with the subject of corporations, entirely overlooked public service corporations in the special and only section of its work which relates to the incorporation of business enterprises and the surrender or repeal of charters of incorporation. What section 154 of the Constitution plainly did was to provide for the creation, extension and amendment of charters of every kind, under general laws to be enacted by the General Assembly; to preserve the right of repeal by the State; and to delegate to the General Assembly the power and duty of providing, as it might see proper, but by general laws, for the voluntary surrender of the charter of any corporation, regardless of its class—a reservation to the State of the power of repeal, and a consent by the State to a voluntary dissolution.

This underlying plan and principle of section 154 is only fair and just. Charters of incorporation are contracts between the incorporators and the State. The public has an interest in public service corporations, but it does not own

them.    Private property invested in a railroad enterprise becomes impressed with a public service, but still remains the property of the stockholders and cannot be confiscated. The public has never yet been held to have a vested right in the perpetual operation of a railroad or other public service corporation.    Section 1294-b (16) of the chapter of the Code of Virginia relating exclusively to public service corporations very clearly contemplates the possibility of a complete dissolution and a termination of the franchise of such a corporation, followed by a distribution of "the proceeds of its works, property and debts among those entitled thereto," who, of course, would be the creditors and stockholders.

That inconvenience and hardship may and probably will result when railroads and other public utilities cease operations is undeniably true; but the same thing is just as likely to be true, in greater or less degree according to the character and extent of the corporate enterprise, of the dissolution of purely private corporations, concerning which no question is made as to their right to dissolve without notice.    There are thousands of our citizens and hundreds of our communities to-day dependent almost entirely upon the operation of the plant of a single industrial corporation. Their hope lies in the principle that persons engaged in such enterprises will not be likely to give them up as long as there is reasonable profit or prospect of profit in the business.    The same principle will likewise in large measure protect patrons of railroad companies against a surrender of their charters.    Whether the law, as it now exists, is sufficiently safeguarded or not, there is no power anywhere to compel the stockholders of a corporation, public or private, to continue indefinitely the prosecution of a losing business.    The law permitting the voluntary dissolution of public service corporations has been on the statute books of this State for more than ten years, has been recognized

and accepted as the law of the land by the representatives of the Commonwealth, and no very disastrous consequences appear as yet to have followed.

And in this immediate connection it is pertinent to add, that until the question arose in this case, the terms of section 1105-e (30) have been accepted and applied to public service corporations by the State Corporation Commission, not only as formerly constituted, but as organized at present. As early as 1908 the commission submitted the question to Hon. Wm. A. Anderson, whose opinion as a distinguished member of the Constitutional Convention is entitled to great respect, and who at the time of the inquiry addressed to him was the Attorney General of the State and, as such, the legal adviser of the commission. He replied as follows:

"Any corporation, whether organized under the act concerning corporations, which became a law on the 21st day of May, 1903, and the acts amendatory thereof, or under any charter heretofore granted by any court, or by the General Assembly, may be dissolved as is expressly provided for in section (30) of chapter V of said act concerning corporations (as said section was amended by the act approved March 20, 1906) in the manner prescribed in that section; and the affairs of such corporation may be wound up and its property disposed of, and its debts and liabilities paid or provided for, subject to the provisions of section (31), (32), (33) and (34) of that chapter; and where the franchises and property of the corporation are sold under a deed of trust or a decree of court, they may be sold in accordance with the provisions of section (36) of chapter V of said act.

"As I understand the inquiry, the corporation to which it relates is a railroad company. I do not find any provision in the act concerning corporations which excepts rail-

road corporations from the operation of the enactments in regard to the dissolution of corporations generally above referred to."

This opinion by Attorney General Anderson we believe to be in accordance with the plain letter of the statutes on the subject. The State Corporation Commission, composed personally of the same learned and distinguished men who participated in the consideration and decision of the instant case, have heretofore acted upon this interpretation, as shown by the records of the commission and the concession of counsel, and particularly by the written statement of the chairman, under date of April 27, 1917, with reference to the dissolution of the Ocean View Railroad Company, in which, quoting from subsection (30) of 1105-e, he said: "There is no discretion left to the commission in the matter of issuing such an order, as the law is mandatory whenever all the stockholders of the corporation consent to the dissolution." It is true that after the order complained of in this case, denying the certificate, had been entered, the chairman wrote a second letter to the party to whom the communication last above quoted from was addressed, explaining that, upon the investigation of the present case, he had changed his mind. With great deference, we think the first impression of the chairman was the better. His change of view, as his opinion shows, was the outcome of a solicitous and commendable regard for the interest of the public and his fear of possible consequences to the public from a different conclusion. The latter consideration, however, is one which, as we have seen, has been committed to and rests with the legislature. The powers of the Corporation Commission are large and its functions are of great importance; but in its control over corporations these powers and functions do not extend beyond the point of requiring corporations to comply with the terms of their charters and the laws of the State.

The record indicates that the Tidewater and Western Railroad Company, like its unfortunate predecessor, was doomed to failure, and that a dissolution, either voluntary or involuntary, was inevitable; so that, in the instant case, the result in the end would perhaps not have been very materially different if the law had authorized an inquiry by the commission. We must not be understood, however, as intending to detract from the argument that there should be some safeguards against the voluntary cessation of the business of a public service corporation; and we are informed that the revisors of the Code, appreciating the desirability of some further legislation on the subject, have incorporated into their work of revision an amendment to section 1105-e, subsection 30, which, if adopted, will require notice to the public and the consent of the commission before the corporation can voluntarily dissolve.

(5) The contention that section (30), as amended, is unconstitutional because it violates section 52 of the Constitution, providing that no law shall embrace more than one object, which shall be expressed in its title, is, as we think, wholly untenable. The act which amended subsection (30) of chapter 5 was entitled, "An act to amend and re-enact section (30) of chapter 5 of an act entitled an act concerning corporations, which became a law on the 21st of May, 1903" (Acts 1906, page 576). The five chapters adopted by the General Assembly in one comprehensive act under the title now perfectly familiar to the profession as "an act concerning corporations," were intended to codify the law of this State with respect to charters of incorporation. To hold that the act amending subsection (30) of chapter 5 is insufficient in its title would discredit the validity of the entire act, and would disregard the settled interpretation placed on section 52 of the Constitution by previous decisions of this court. The original subsection (30) related to the general subject of the dissolution of all

corporations, and the section as amended does the same thing, but in a more complete and comprehensive manner.

In the case of *Bertram* v. *Commonwealth*, 108 Va. 902, 62 S. E. 969, it was held by this court, following the leading case of *Commonwealth* v. *Brown*, 91 Va. 762, 771, 21 S. E. 357, 28 L. R. A. 110, that the title of an act amending the Code is sufficient if it refers to the chapter and sections to be amended and the body of the amendatory act is within itself germane to the subject of the chapter referred to in the title. The principle of the decision in those cases would seem to apply in the present instance. The subject matter contained in subsection (30), as amended, is manifestly within the scope of the original "act concerning corporations," which, though perhaps not strictly speaking a part of the Code, is of great dignity and importance, and is substantially a part of the Code by legislative authority. (Acts 1902-3-4, p. 437). The question, however, is set at rest by the established principle that wherever the title of the original act is sufficient, the title of subsequent amendatory acts is a matter of no consequence. In the case of *District Road Board* v. *Spilman*, 117 Va. 201, 84 S. E. 103, Judge Whittle, delivering the opinion of this court, said: "In considering this branch of the subject too, the principle is not to be lost sight of, that where an act is amendatory of an original act, the title of which in itself is adequate to cover the amendment, the constitutional requirement is satisfied and the subsequent title becomes unimportant." See also, *Miller* v. *Hurford*, 13 Neb. 13, 12 N. W. 832, 834, and cases cited; *Dallis* v. *Griffin*, 117 Ga. 408, 43 S. E. 758, 759; and especially *Commonwealth* v. *Brown*, *supra*, 91 Va. 773, 21 S. E. 357, 28 L. R. A. 110, and authorities there cited, and *Tresnon* v. *Supervisors*, 120 Va., 90 S. E. 615.

(6) In emphasizing the importance of the powers vested in the commission by the Constitution, the point is made

that there never could have been any intention on the part of the law-makers to delegate to the commission in a purely ministerial capacity the discharge of so important a function as that of issuing to a public service corporation a certificate of dissolution, and Commissioner Wingfield goes so far as to say that "in no case can this commission be considered a mere ministerial body." Nothing could be further from our purpose than to speak lightly of the State Corporation Commission and the importance of its judicial and administrative functions. Throughout the past years of its existence it has rendered a distinguished and valued service, and the decisions of this court will show few reversals of its findings. But the argument that the function now in question is too important to be a ministerial act is readily answered by the terms of the Constitution and statutes relating to the tremendously important subject of the creation of corporations, as to which the commission can only act ministerially; and the legislature could not, if it desired, confer upon the commission any judicial or discretionary power in regard thereto. (Const. sec. 144).

(7) It appears that between May 10, 1917, the time of the filing of the original certificate of unanimous consent of the stockholders, the due and formal execution of which was questioned by the chairman of the commission, and May 17, 1917, the time of its final amendment as to signatures and execution in such form as to satisfy the chairman in that respect, the Tidewater and Western Railroad Company applied to the Chancery Court of the city of Richmond for the appointment of a receiver, and a receiver was accordingly appointed. The chairman of the commission, in his written opinion, and counsel seeking to sustain the judgment complained of, rely upon this proceeding in the chancery court as a reason for refusing the certificate of dissolution, if we should hold that otherwise it ought to have been granted. The question, of course, is quite sub-

57

ordinate to the main issue. It appears not to have been made at the hearing before the commission. In no event, however, could it have had any proper influence upon the action of the commission. The sole question before that body was whether the company had complied with the law entitling it to a certificate of dissolution. If it had, it was the duty of the commission to issue the certificate, and no court except on appeal) could enter any order that would "interfere with the commission in the performance of its official duties." (Const., sec. 156.) This was not a conflict or contest for jurisdiction between the two tribunals having concurrent powers, but if it had been, the matter was already pending before the commission, as the commission knew and as the record in the chancery case showed, and nothing could have been done in the chancery cause to defeat the jurisdiction of the commission. Moreover, the receivership, as disclosed by the bill and decrees in the cause, was entirely consistent with the dissolution proceedings, and might very properly have been brought, as it may yet very properly be proceeded with, after the issuance of the certificate. The status of all corporations, after dissolution, is expressly preserved by the statute for the purpose of "prosecuting or defending suits by or against them, and of enabling them gradually to settle and close their business, to dispose of and convey their property, and to divide their capital, but not for the purpose of continuing the business for which said corporation shall have been established." A receivership suit may often be, as in this case, perfectly consistent with and in aid of the limited purposes for which the corporation, after its formal dissolution, is thus kept alive.

We may well conclude this discussion with the following extract from the opinion of Commissioner Rhea, which we approve and adopt:

"The duty imposed upon the commission, in my judgment, is purely ministerial, and if it never acted the legal status of a corporation would be fixed upon the filing of the consent of the stockholders.

"The law may be unwise, but it is useless to discuss this. Its enforcement will doubtless work serious hardships, and I exceedingly regret this result. This commission, however, should follow the law as it is plainly written in the statute. Any other course would be fraught with danger to all citizens, both corporate and otherwise. The legislature alone can make laws, and it is supposed that we will fairly but firmly execute them. If the law is wrong, the legislature alone must be appealed to. * * * I will not discuss the question upon which so great a part of the majority opinion is based, of abandonment or discontinuance of service by public service corporations, without notice and without the approval of the State Corporation Commission. That proposition is controlled by entirely different principles, which have no application here. There is no question here of abandonment or discontinuance of service as those terms are understood in our law. This is purely a question of the dissolution of a corporation in the manner provided by statute, and we have no power to prevent it where the statute has been complied with as it has been, in my judgment, in this case.

"I do not understand the pertinency of the discussion in the majority opinion of the subscriptions of various localities to the stock of the old Farmville and Powhatan Railroad Company, predecessor of the Tidewater and Western. It is to be deplored that this unfortunate investment, along with the investment of other stockholders, was wiped out by a judicial sale, purchase and organization of a new company under the name of the Tidewater and Western Railroad

Company. It is also to be regretted that the new company seems to have inherited many, if not all, of the ills and misfortunes of its predecessor.

"The effect of a receiver having been appointed since this application was filed, and to which so much attention is given in the majority opinion * * * is, in my opinion, immaterial. This matter was argued orally and submitted upon briefs upon the question of dissolution, and the receivership then existing was neither argued nor relied upon, but, in my view, this is also immaterial, for the reason that the corporation was, in effect, dissolved when the consent application was filed, and the Corporation Commission only had a ministerial function to perform of issuing the certificate. Whatever financial difficulty the Tidewater and Western may have had for many years past, and the losses sustained by its owners and bondholders, is not necessary for me to discuss now. It may be that the receivership was hastened by our non-action. At all events, I take it in a proper case the courts could have proceeded by the appointment of a receiver whether we had acted upon the application or not."

For the reasons above stated, the judgment must be reversed and the cause remanded to the Corporation Commission, with direction to issue the certificate of dissolution.

*Reversed.*