## CIRCUIT COURT OF CAROLINE COUNTY

Oliver C. Fortune
and Gladys M. Fortune

v.

Hortense B. Rich

By JUDGE WILLIAM H. LEDBETTER, JR.

### September 11, 1987

After hearing evidence in the above-referenced case at a bench trial in Caroline County Circuit Court on September 9, 1987, the court ruled as follows:

1. Record title to the parcel of land described as a 0.343-acre parcel between Market Street and King Street in the Town of Port Royal, on a plat made by William W. Webb, Jr., P.L.S., dated September 16, 1985 (Stipulated Exhibit # 1), is vested in the plaintiff.

2. Record title to the parcel adjoining the above-mentioned property on the northeast is vested in the defendant.

3. The common boundary line between the aforesaid parcels is accurately established as being the line shown on the Webb plat: in other words, beginning at an iron pipe set in the right-of-way of Market Street approximately 77.1 feet from the intersection with Back Street, then S 44° 46' 44" E 99 feet to an iron pipe found; SUBJECT, however, to the defendant's claim of title by adverse possession to that portion of the 0.343-acre parcel which is shown on the Webb plat as being enclosed by a fence, containing according to evidence approximately 300-325 square feet.

4. The court makes no adjudication on the central issue in dispute, i.e., the defendant's claim of title

by adverse possession, pending submission of memoranda of law by counsel.

### December 2, 1987

This is an adverse possession case. It began in December of 1986 when Oliver C. and Gladys M. Fortune filed this action under Virginia Code § 8.01-179 et seq. to establish the true boundary line between their property and the property of Hortense B. Rich, a coterminous landowner. The defendant filed grounds of defense alleging ownership by adverse possession of a portion of the land claimed by the plaintiffs.

The parties have stipulated the accuracy of a plat of survey made by William W. Webb, Jr., dated September 16, 1985 (Stipulated Exhibit # 1). The Fortunes' parcel is described on the Webb plat as "(19)," containing 0.343 acres. The defendant's parcel, to the east of and adjacent to the Fortunes' parcel, is described on the Webb plat as "(17)."

For convenience, the plaintiffs are hereinafter referred to as "the Fortunes" and their property as "Lot 19"; the defendant is hereinafter referred to as "Rich" and her property as "Lot 17"; and the land in controversy is hereinafter referred to as "the disputed area."

Rich concedes that the boundary line between Lot 19 and Lot 17 as shown on the Webb plat would constitute the true common boundary *but for* her claim of title by adverse possession to approximately 300-325 square feet of Lot 19. Further, Rich does not challenge the Fortunes' chain of title to Lot 19, which can be traced in the land records for many years. Thus, it is agreed that Rich's adverse possession claim is the central issue.

The Fortunes acquired Lot 19 by deed dated November 22, 1985, from Mattie Estelle Walker and James Walker (Plaintiffs' Exhibit # 6). The property is located on Market Street and runs the length of a block to King Street, in the Town of Port Royal.

Lot 17 is located to the east of Lot 19 on Market Street. Rich first moved to Lot 17 with her husband in 1945 as a tenant of Mattie B. Selby. She acquired title to Lot 17 by devise from Selby in 1966. A year or so later, Rich installed a chain link fence along her rear line

and between her lot and Lot 19. She gave the installers a Wigglesworth plat to use (Stipulated Exhibit # 2), making no effort to verify its accuracy. The fence took in approximately 300-325 square feet of Lot 19, shown on the Webb plat as a shaded area, which constitutes the disputed area.

The disputed area, enclosed by the fence since 1967 or 1968, is the same area that Rich has used for many years as a "side yard" to Lot 17, as a garden, as a woodpile area, as a place to store a garden tractor and wagon, and as a hog pen.

An ore tenus hearing was held on September 9, 1987. Because the parties stipulated the Fortunes' chain of title to Lot 19, the focus of the evidence was on Rich's claim of adverse possession. After hearing the evidence, the court made three rulings, none of which involved matters that the parties seriously disputed, and confirmed the rulings in a latter to counsel dated September 11, 1987.

The court requested memoranda on the issue of adverse possession. The attorneys submitted well-researched, concise, and cogent memoranda on November 18th and 20th.

The doctrine of adverse possession has two facets. First, from the point of view of the record owner seeking to recover the land, the doctrine acts as a procedural bar to enforcement of his right to exclude others from his property. In this sense, the doctrine (now codified) is similar to other statutes of limitation which set up time bars to the assertion of rights. Second, as a rule of property law, the doctrine acts as a transfer device for legal title to real estate. Viewed from this perspective, the effect of adverse possession for the statutory period is to divest title of the record owner and to transfer it, involuntarily, to the adverse claimant.

To establish title to land by adverse possession, it is necessary to show actual, hostile, exclusive, visible and continuous possession for the statutory period of fifteen years. *McIntosh v. Chincoteague Volunteer Fire Co.*, 220 Va. 553 (1979); Virginia Code § 8.01-236. "Actual" and "visible" are sometimes used interchangeably with, or in addition to, "open" and "notorious" possession in the cases.

To satisfy the requirements of adverse possession, the claimant must possess the land in such a way as to

amount to an ouster of the true owner; i.e., in such a manner as to give notice "that seisin is molested." *LaDue v. Currell*, 201 Va. 200 (1959).

It is also said that the claimant must establish use of and dominion over the land or such visible change in its character as amounts to a complete ouster of the superior record title. 1A M.J., *Adverse Possession*, sects. 4, 5 and 6.

> The usual kind of actual possession relied upon is occupancy, use, or residence upon the premises for the statutory time, evidenced by cultivation, enclosure, or erection of improvements, or other plainly visible, continuous, and notorious manifestation of exclusive possession in keeping with the character and adaptability of the land . . . . To effect a disseisin, the holding must be actual and hostile occupation of the land for the statutory period that is calculated to give notice that the seisin is molested . . . .

> No precise general rule of application can be laid down. Any act, or series of acts, which shows the open, notorious, exclusive, and hostile possession of one who claims to be the owner of the land may be proven as evidence of adverse possession. However, irrespective of the character of ownership asserted, acts of dominion over the land must, to be effective as against the true owner, be so open, notorious, and hostile as to put an ordinarily prudent person on notice of the fact that his lands are in the adverse possession of another. *LaDue, supra; also see Harman v. Ratliff*, 93 Va. 249 (1896).

Adverse possession may be set up as a defense to an action under § 8.01-179. *Christian v. Bulbeck*, 120 Va. 74 (1916). The burden of establishing adverse possession under such circumstances is upon the defendant. *Westland Realty Corp. v. Griffin*, 151 Va. 1005 (1928).

The Fortunes concede (Memoranda, p. 2) that Rich's evidence at the ore tenus hearing establishes the elements

of actual, exclusive, open, and notorious possession. However, they argue, the element of hostility is missing because Rich never intended to enclose or otherwise lay claim to any property which does not belong to her.

Rich testified that she and her husband began using the disputed area as soon as they moved to Lot 17, after asking permission of Selby, in 1945. Thereafter, a portion of the land was cultivated and used as a garden, the grass was mowed, firewood was stacked and kept there, a tractor and wagon were kept there, and a hog pen was erected. After Mr. Rich died in 1965, she kept the disputed area cleared and mowed until recently. As noted above, she enclosed the disputed area in 1967 or 1968 after acquiring ownership of Lot 17 by devise from Selby in 1966. Rich stated that she has asserted ownership over the disputed area at all times since 1945.

Daisy Byrd, postmistress of Port Royal, recalled that Rich had a garden in the disputed area almost every year that she lived there, until her husband died. She attested the location of the stacks of firewood, the garden tractor and wagon, and the clearing and mowing. She said that she remembers that Rich installed the fence shortly after the death of Mr. Rich, and no one ever questioned her claim to the enclosed area. She said that "most people around here" knew that Rich used the disputed area.

Without repeating all the details, similar testimony was given by Estelle H. Howell, Ruth J. Cadden, Walter Baylor, and Eddy Golden, all long-time residents of the neighborhood who are and have been familiar with the parties and the property for decades, and Dorothy Smith, Rich's sister who has visited frequently during the forty-three-year period that Rich has lived there.

Nevertheless, the Fortunes contend, Rich has failed to establish her claim because her possession and use of the disputed area has been through a misapprehension or mistake as to the boundary of her Lot 17 with no intention to claim as her own that which does not belong to her, but only to claim to the true line wherever it may be. They cite *Christian v. Bulbeck*, 120 Va. 74 (1916), in support of their position.

*Christian v. Bulbeck*, a meandering forty-page opinion, is the leading Virginia case on the subject of mistaken possession and is most often cited for the following sim-

plistic proposition: where a person occupies and possesses the land of another through a misapprehension or mistake as to the boundaries of the land, with no intention to claim as his own that which does not belong to him, but only intending to claim to the true boundary line, wherever that may be, he does not hold adversely; and since the intention to hold adversely is an indispensable requisite of adverse possession, a claimant cannot prevail under such circumstances.

It is true that the court approved the above-stated proposition of law, which was contained in a jury instruction of the trial court. Specifically the court said that the "instruction correctly expounds the law when stated in reference to a case to which it is applicable. . ." The court held, however, that it was error to give the instruction under the facts of that case.

The court then discussed the proposition for ten pages, generally in disapproving terms, and concluded with a statement of the "correct rule in Virginia" which rephrased the proposition altogether.

First, the court limited the "mistaken possession" rule to the case where there is no intention on the part of the adverse claimant to hold adversely up to a boundary line *on the ground*. "No especial significance, therefore, is to be given to the taking of possession under a mistake as to the true boundary, nor any especial or conclusive presumption is to be inferred as resulting from it." The fact remains, the court emphasized, that if there is proof of specific intent to hold adversely, from that moment the possession will be adverse, and the statute of limitations will begin to run regardless of the prior absence of intent to claim adversely.

The court cited several Virginia cases and then pointed out that "the cases elsewhere are not in harmony on this subject, but the conflict is more seeming than real."

The court cited a Maine case which said "a disseisin cannot be committed by mistake," and explained:

But this assumes that there is no proof of intention to claim title beyond the boundary line as *designated in the chain of title* of the possessor -- the *extrinsic* matter of calls in the deed or other evidence of chain of title

being the *controlling factor* of the intention of the possessor. Coupled with this proof, there may or may not be further proof of an actual intention to claim title to *the land itself* up to *a specific boundary line on the ground*, as the *controlling factor* of the intention of the possessor . . . . [I]f such proof be present, the possessor is shown by such further proof itself to have taken a step further in his mental process and to have decided for himself, then and there, without waiting for any future more definite ascertainment thereof, that the lines called for in his chain of title have in fact a definite *locus* on the ground, which he then and there fixes upon definitely and claims title up thereto. It is true that in taking such definite action, he may be mistaken in his location as compared with the true location of the lines called for in his chain or claim of title. It may be true that but for such mistake, he would never have taken the further step of forming the definite intention to claim title up to the definite location of the line in question on the ground; but the fact exists that he did form such definite intention. In such case, if he has no other claim of title than his true title, he has no color of title to give him constructive possession beyond the true boundary line. But he may, nevertheless, take and hold possession by pedis positio or actual possession beyond his true boundary line, and with such bona fide, though mistaken, claim of title to the extent of such pedis positio or actual possession, he will have adverse possession, which if continued unbroken for the statutory period will ripen into a perfect title under the statute of limitations . . . . Otherwise, the statute of limitations would not run in favor of possession under a bond fide claim of title when possession is taken beyond the bounds of true title, and no honest man could acquire title under such statute. His very honesty and bona fides would rob him of the benefit

of the statute. As said in *Cole v. Parker*, 70 Mo. 372: "Honest men always enclose land not their own by mistake, or with the consent of the owner, and if the law on this subject were not as this court has held, the statute of limitations would never run in favor of an honest man because he would never avow his purpose to have been to take the land of another."

In Virginia, the court concluded, on the whole proof a case must be presented in which "the preponderance of evidence as to the character of the possession, how held, how evidenced on the ground, how regarded by the adjoining landowner, etc., etc., supplies the proof that the definite and positive intention on the part of the possessor to occupy, use, and claim as his own land up to a particular and definite line *on the ground* existed, coupled with the requisite possession, for the statutory period, in order to ripen title under the statute." Whether the "positive and definite intention to claim *as one's own* the land up to a particular and definite line on the ground" has been proven is the relevant, practical test. Whether the possessor would have claimed the land as his own had he not been mistaken as to the true boundary line called for in his chain of title "is irrelevant and serves only to confuse ideas."

Thus, the essence of *Christian v. Bulbeck* is not found in the headnotes, or in the proposition for which the case is cited in *Michie's Jurisprudence*, but in the elaborate, critical examination of the proposition of "mistaken possession" in boundary line cases discussed above.

*Christian v. Bulbeck* is consistent with the position taken in most jurisdictions, which hold that occupancy to a visible and ascertained boundary for the statutory period is the controlling feature in determining hostility in mistaken boundary line cases. It is held with increasing frequency that an open, notorious, and hostile possession for the statutory period is sufficient for the acquisition of title by adverse possession, and the fact that the possession was taken under mistake or ignorance as to boundary lines is immaterial. 3 Am. Jur. 2d, *Adverse Possession* § 56. In fact, a national publication cites *Chris-*

*tian v. Bulbeck* for the proposition that where an intention is manifested to claim title to a visible, fixed, and ascertained boundary line, the possession is hostile although it is erroneously assumed to be the true line and the possession is held and the claim made because of the mistake as to the location of the boundary. *See* 3 Am. Jur. 2d, *Adverse Possession* § 60.

The application of the standard discussed above is salutary. If possession through mistake were held not to be adverse, at least where there is actual possession to a visible and ascertained boundary, very little room would be left for the operation of the statute of limitations because almost every person who acquires land under bad title, or takes possession of land without true ownership of it, does so under the mistaken idea that his title is good.

Further, it always has been held that the element of hostility is practically synonymous with the word "adverse" and does not require a showing of ill will or malevolence. 1A M.J., *Adverse Possession* § 11.

The evidence establishes that Rich always has had a specific intention to claim title to a definite line on the ground in fact beyond the true line. The *controlling factor* of her intention has been to claim title to a specific line, the locus of which she fixed upon definitely, and to claim title up to it. Her use and possession of the disputed area has been more than constructive, it has been by pedis positio or actual possession under a bond fide, though mistaken, claim of right. Applying the standard enunciated in *Christian v. Bulbeck*, Rich's burden of proof of the element of "hostility" has been met.

The Fortunes place great reliance on the fact that Rich provided a plat to the installers of the fence, which, they argue, shows that she intended to enclose only so much of the land as belongs to her. This argument, though artfully presented, overlooks the fact that the plat was provided without thought of its accuracy; and it ignores the very important circumstance that the fence was erected along the same line as that claimed on the ground by Rich and her husband for more than two decades prior to the enclosure. In fact, then, the fence did nothing more than enclose the land that had been claimed by Rich since 1945, i.e., the disputed area, and followed the line that had

been for all that time the *definite locus on the ground* which Rich had fixed upon and claimed up to.

Accordingly, consistent with the principle explained in *Christian v. Bulbeck* and other Virginia cases, and in line with the great weight of authority, it is the opinion of the court that Rich has proven the element of hostility. Combined with the clear and persuasive evidence of an open, actual, exclusive, and continuous possession of the disputed area for a period in excess of fifteen years, the evidence on the whole case supports Rich's claim to the disputed area by adverse possession.

For the reasons discussed above, Rich has acquired title to the land enclosed by her fence, i.e., the disputed area of approximately 300-325 square feet of Lot 19, by adverse possession. Therefore, the true and correct boundary line between these coterminous landowners is determined to be along the existing fence line as shown on the Webb plat.